**Teresa H. Pearson, OSB No. 953750**
teresa.pearson@millernash.com
**Andrea M. Barton, OSB No. 092760**
andrea.barton@millernash.com
Miller Nash LLP
3500 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204
Telephone: (503) 224-5858

      Attorney for Creditor
      Baek Family Partnership, LLC

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 13-35719-elp7 |
| **GREGORY DALE THOMAS**, | |
| Debtor. | Chapter 7 |
| | Adversary Proceeding No. _____ |
| **BAEK FAMILY PARTNERSHIP, LLC** | |
| Plaintiff, | **COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT** |
| v. | |
| **GREGORY DALE THOMAS**, | |
| Defendant. | |

Plaintiff Baek Family Partnership, LLC ("BFP") alleges:

## <u>JURISDICTION</u>

1.     This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and United States District Court Local Rule 2100-1. The matters in controversy arise under 11 U.S.C. § 523(a). Venue is proper pursuant to 28 U.S.C. § 1409. This Court has constitutional authority to decide this case, and BFP consents to this Court's entry of final orders and judgment.

Page 1 -     Complaint to Determine Nondischargeability of Debt

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE (503) 224-5858
3500 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE, PORTLAND, OREGON 97204-3699

PDXDOCS:2016396.3

Case 13-03291-elp   Doc 12   Filed 01/10/14

2. Defendant Gregory Dale Thomas ("Debtor") filed his petition under Chapter 7 of the United States Bankruptcy Code on September 6, 2013.

3. Pursuant to the Notice of Commencement of Case, the deadline for filing this complaint is December 6, 2013.

## FACTS

4. BFP is an Oregon limited liability corporation. BFP owns and manages a commercial building located at 8201 S.E. Powell Boulevard, Portland, Oregon (the "Property").

5. At all relevant times, Clown Corp. ("Clown") was an Oregon corporation and Debtor was the president of Clown Corp.

6. On or about December 11, 2012, BFP and Clown entered into a lease (the "Lease"), pursuant to which Clown leased space in the Property (the "Premises"). A true copy of the Lease is attached as Exhibit 1 and is incorporated herein by this reference.

7. In consideration for BFP's agreement to lease the Premises to Clown, Debtor entered into a personal guaranty ("Guaranty") in which he guaranteed the payment of all amounts owed by Clown to BFP and the prompt performance of all other obligations of Clown under the Lease. The Guaranty is set forth in Exhibit B to the Lease attached hereto as Exhibit 1.

8. As a condition to entering into the Lease and accepting the Guaranty, on or about December 12, 2012, BFP required, and Debtor provided to BFP, a written statement regarding Debtor's financial condition (the "Financial Statement"). A true copy of the Financial Statement (with the Debtor's social security number and date of birth redacted) is attached as Exhibit 2 and is incorporated herein by this reference.

9. The Financial Statement listed significant assets of Debtor, including cash, stocks, bonds, real property, and other personal property with a stated net worth of over one million dollars.

Page 2 -    Complaint to Determine Nondischargeability of Debt

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE (503) 224-5858
3500 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE, PORTLAND, OREGON 97204-3699

PDXDOCS:2016396.3

Case 13-03291-elp    Doc 12    Filed 01/10/14

10.     The term of the Lease was for a period of sixty-five months (the "Term") commencing on January 7, 2013 (the "Commencement Date").  Pursuant to the Lease, Clown promised to pay monthly rent (the "Rent").  BFP would have received $411,419.88 over the Term of the Lease if Clown fully performed the Lease.

11.     Clown breached the Lease and failed to pay any Rent.  Clown's failure to pay Rent and other charges due under the Lease constituted a default under the Lease.  Based on Clown's default, BFP provided proper notice to Clown and Debtor of the default.

12.     In the event of a default under the Lease, BFP was entitled to (a) terminate Clown's right to possession of the Premises by written notice to Clown, (b) re-enter and re-let the Premises, and (c) recover damages as set forth in the Lease.

13.     Debtor breached the Guaranty by not paying the amounts owed by Clown to BFP under the Lease.

14.     As a result of Clown's default under the Lease and Debtor's breach of his Guaranty, BFP has been damaged in an amount of more than $411,419.88.

15.     BFP has incurred attorney fees, costs, and disbursements in connection with enforcing the Lease and the Guaranty.  Pursuant to the Lease and the Guaranty, BFP is entitled to recover those attorney fees, costs, and disbursements.

## **FIRST CLAIM FOR RELIEF**
### 11 U.S.C. § 523(a)(2)(B)

16.     Plaintiff realleges paragraphs 1 through 15.

17.     Debtor and Clown obtained money, property, services, or an extension, renewal, or refinancing of credit by entering into the Lease and Guaranty with BFP.

18.     The Financial Statement provided by Debtor was materially false.

19.     BFP reasonably relied on the Financial Statement to enter into the Lease and Guaranty.

Page 3 -      Complaint to Determine Nondischargeability of Debt

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE (503) 224-5858
3500 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE, PORTLAND, OREGON  97204-3699

PDXDOCS:2016396.3

Case 13-03291-elp     Doc 12     Filed 01/10/14

20.    Debtor made and published the Financial Statement to BFP with the intent to deceive BFP.

21.    If BFP had known the Financial Statement was false, it would not have entered into the Lease and Guaranty.

22.    As a result of entering into the Lease and Guaranty, BFP has been damaged in an amount to be proven at trial but not less than $411,419.88.

12.    The obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

WHEREFORE, BFP prays for a judgment as follows:

1.    Awarding BFP judgment against Debtor on the Guaranty in an amount to be proven at trial but not less than $411,419.88;

2.    Awarding BFP its attorney fees, costs, and disbursements incurred herein to the extent allowed by law;

3.    Adjudging that the Debtor's obligation under the Guaranty is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B); and

4.    Granting such other and further relief as the Court deems just and proper.

DATED this 26th day of November, 2013.

MILLER NASH LLP

/s/ Teresa H. Pearson

Teresa H. Pearson, OSB No. 953750
teresa.pearson@millernash.com
Andrea M. Barton, OSB 092760
andrea.barton@millernash.com
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon  97204
Telephone:  (503) 224-5858
Fax:  (503) 224-0155

Attorneys for Creditor
Baek Family Partnership, LLC

Page 4 -    Complaint to Determine Nondischargeability of Debt

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE (503) 224-5858
3500 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE, PORTLAND, OREGON  97204-3699

PDXDOCS:2016396.3

Case 13-03291-elp    Doc 12    Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

RETAIL LEASE

Between:

**_Baek Family Partnership, LLC_**
("Landlord")

And

**_Clown Corp._**
("Tenant")

Dated  12/14/12



EXHIBIT 1
Page 1 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

Standard Form of RETAIL LEASE

## © 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

### TABLE OF CONTENTS

Page

| | | | Page |
|---|---|---|---|
| 1. | TERM | | 3 |
| 2. | RENT | | 3 |
| | (a) | Base Rent | 4 |
| | (b) | Percentage Rent | 4 |
| | (c) | Statement of Gross Sales | 4 |
| | (d) | Records of Gross Sales | 5 |
| | (e) | Definition of Gross Sales | 5 |
| | (f) | No Partnership Created | 5 |
| | (g) | General | 5 |
| | (h) | Place of Payment | 6 |
| | (i) | Prepaid Rent | 6 |
| 3. | SECURITY DEPOSIT | | 6 |
| 4. | ADDITIONAL RENT | | 6 |
| | (a) | Operating Expenses | 6 |
| | (b) | Property Taxes and Insurance | 7 |
| | (c) | Payment of Operating Expenses, Taxes and Insurance | 7 |
| 5. | INSURANCE; INDEMNITY | | 7 |
| | (a) | Insurance | 7 |
| | (b) | Increases in Premiums | 8 |
| | (c) | Indemnity; Tenant's Insurance | 8 |
| 6. | USE OF PREMISES | | 9 |
| 7. | TENANT IMPROVEMENTS AND ALTERATIONS | | 11 |
| 8. | REPAIRS AND MAINTENANCE | | 11 |
| | (a) | Landlord's Responsibilities | 11 |
| | (b) | Tenant's Responsibilities | 12 |
| | (c) | Inspections | 12 |
| | (d) | Landlord's Work | 12 |
| 9. | LIENS; TENANT'S TAXES | | 13 |
| 10. | UTILITIES AND SERVICES | | 13 |
| 11. | ICE, SNOW, AND DEBRIS | | 13 |
| 12. | WAIVER OF SUBROGATION | | 13 |
| 13. | INJURY TO TENANT'S PROPERTY | | 13 |
| 14. | DAMAGE OR DESTRUCTION | | 14 |
| | (a) | Partial Destruction | 14 |
| | (b) | Substantial Damage | 14 |
| | (c) | Restoration | 14 |
| 15. | EMINENT DOMAIN | | 14 |
| | (a) | Partial Taking | 14 |



i

EXHIBIT 1
Page 2 of 48

|  |  |  |  |
|---|---|---|---|
|  | (b) | Substantial Taking of the Property | 15 |
|  | (c) | Substantial Taking of Premises | 15 |
|  | (d) | Definition | 15 |
| 16. | BANKRUPTCY | | 15 |
| 17. | DEFAULT | | 15 |
| 18. | REMEDIES ON DEFAULT | | 16 |
| 19. | SURRENDER AT EXPIRATION | | 17 |
|  | (a) | Condition of Premises | 17 |
|  | (b) | Fixtures | 17 |
|  | (c) | Holdover | 18 |
| 20. | ASSIGNMENT AND SUBLETTING | | 18 |
|  | (a) | Landlord's Consent | 18 |
|  | (b) | Payment to Landlord and Termination of Lease | 19 |
| 21. | SUBORDINATION | | 19 |
| 22. | TRANSFER OF THE PROPERTY | | 20 |
| 23. | ESTOPPEL CERTIFICATE | | 20 |
| 24. | PERFORMANCE BY LANDLORD | | 20 |
| 25. | LANDLORD'S RIGHT TO CURE DEFAULT | | 20 |
| 26. | INSPECTION | | 20 |
| 27. | FOR SALE AND FOR RENT SIGNS | | 20 |
| 28. | ATTORNEY FEES | | 20 |
| 29. | NOTICES | | 21 |
| 30. | BROKERS | | 21 |
| 31. | LATE CHARGES | | 21 |
| 32. | NO PERSONAL LIABILITY | | 21 |
| 33. | MISCELLANEOUS PROVISIONS | | 22 |
| 34. | QUIET ENJOYMENT | | 23 |
| 35. | ANTI-TERRORISM LAW | | 23 |
|  | (a) | Tenant represents and warrants to Landlord as follows: | 23 |
|  | (b) | Tenant covenants that it shall not: | 24 |
| 36. | FINANCIAL STATEMENTS | | 24 |
| 37. | WAIVER OF JURY TRIAL | | 24 |
| 38. | EXHIBITS AND ADDITIONAL PROVISIONS | | 24 |
| 39. | REPRESENTATIONS; PREPARATION | | 24 |



EXHIBIT 1
Page 3 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

## © 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

### SUMMARY OF FUNDAMENTAL PROVISIONS

       Following is a summary of the basic provisions contained in the Lease. In the event of any conflict between any provision contained in this Summary and a provision contained in the balance of the Lease, the latter shall control.

| | | |
|---|---|---|
| A. | Name of Landlord: | ***Baek Family Partnership, LLC.*** |
| B. | Address, Facsimile Number, and E-mail for Notices to Landlord: | ***3855 SW 153rd Drive*** <br> ***Beaverton, OR 97006*** <br><br> ***mrutherford@vtmgroup.com*** <br><br> ***(503) 644-6708*** |
| C. | Address for Rent Payments: | ***Baek Family Partnership, LLC.*** <br> ***3855 SW 153rd Drive*** <br> ***Beaverton, OR 97006*** |
| D. | Name of Tenant and Address of Premises: | ***Clown Corp*** <br><br> ***8201 SE Powell Avenue, Suite G*** <br><br> ***Portland, OR 97266*** |
| E. | Address, Facsimile Number, and E-mail for Notices to Tenant: | ***8201 SE Powell Ave Suite G*** <br> ***Portland, OR 97266*** <br> ***gregsbackyard@yahoo.com*** |
| F. | Trade Name Under Which Tenant Will Operate at Premises: | ***Farmhouse Lounge*** |
| G. | Business To Be Conducted By Tenant at Premises: | ***Sports Themed Pub; selling food and ancillary thereto sale of alcohol and lottery items.*** |
| H. | Approximate Floor Area of Premises: | ***2,820 square feet*** |
| I. | Lease Term: | ***Sixty Five Months*** |
| J. | Estimated Commencement Date: | ***January 7, 2013*** |
| K. | Base Rent: | See Section 2 |
| L. | Percentage Rent Rate: | _____ % of Gross Sales |



Page 1

EXHIBIT 1
Page 4 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

**© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS**

M.     Tenant's Proportionate
        Share of Additional Rent:        <u>20</u>% of Retail Areas

                                            <u>20</u>% of Building Areas

N.     Landlord's Broker:             ***NAI Norris Beggs & Simpson***

O.     Tenant's Broker:               ***NAI Norris, Beggs & Simpson***

P.     Prepaid Rent                  None

Q.     Security Deposit:              ***$4,200.00, to be paid by Tenant upon delivery of premises by Landlord***

R.     Guarantor's Name and Address:     ***Greg Thomas***

                                            ***PO Box 90637***

                                            ***Portland, OR 97266***



EXHIBIT 1
Page 5 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

THIS LEASE is entered into this _____ day of _____, 20_____, between ***Baek Family Partnership, LLC.***

("Landlord"), and ***Clown Corp*** ("Tenant").

Landlord has constructed, is constructing or will construct a building or buildings and other improvements (the "Building") on ***8201*** that certain property located at ***SE Powell***, in the City of ***Portland***, County of ***Multnomah***, and State of ***Oregon*** (the "Property").

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord certain space on the Property consisting of approximately ***2,820*** square feet, as outlined on the attached **Exhibit A** (the "Premises") on the terms and conditions set forth in this Lease.

1.    **TERM**

The term of this Lease (the "Term") shall be for a period of ***sixty-five*** (***65***) months, commencing on the first to occur of the following dates: (a) ***January 7, 2013***, ~~(b) the date on which Tenant begins to transact business on, at, or from the Premises, or (c) _____ (_____) days after Landlord has delivered possession of the Premises to Tenant with any work to be performed by Landlord in the Premises (as agreed by Landlord in an exhibit attached to this Lease, if any) substantially completed (the "Commencement Date").~~ Tenant shall complete any work required in the Premises, and approved by Landlord pursuant to Section 7 below, within ***thirty*** (***30***) days after Landlord delivers possession of the Premises to Tenant. If the first day of the Term shall be a day other than the first day of a calendar month, then the Term shall be deemed extended by the number of days between the Commencement Date of this Lease and the first day of the first calendar month thereafter, so that the Term shall expire at the end of a calendar month. In the event Landlord allows Tenant the right to early possession of the Premises for the purpose of installation of Tenant's improvements to the Premises or for other purposes, Tenant's entry into the Premises shall be subject to all terms and conditions of this Lease, except the payment of Rent. Tenant's entry shall mean entry by Tenant, its officers, contractors, employees, licensees, agents, servants, guests, invitees, and visitors. If Landlord, for any reason, does not deliver possession of the Premises on the estimated Commencement Date set forth in the Summary of Fundamental Provisions (the "Estimated Commencement Date"), this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting from such delay. In that event, however, Landlord shall deliver possession of the Premises as soon as reasonably practicable. If Landlord is delayed in delivering possession to Tenant for any reason attributable to Tenant, this Lease shall commence on the Estimated Commencement Date set forth in the Summary of Fundamental Provisions. If Landlord, for any reason not attributable to Tenant, is unable to deliver possession of the Premises within one hundred eighty (180) days following the Estimated Commencement Date, either party may terminate this Lease by written notice given within ten (10) days following such party's acquiring knowledge of such delay. ***This lease is contingent upon tenant obtaining an OLCC liquor license and Oregon Lottery license; tenant shall have the one time right to cancel this lease 120 days after lease execution if tenant is unable to obtain licenses. Tenant shall work diligently to apply and obtain licenses.*** Deposit and equipment purchase fee are non refundable.

2.    **RENT**

Beginning on the Commencement Date and continuing during the entire Term, Tenant shall pay to Landlord as rent for each "Lease Year" "Base Rent" as defined in this Section and "Percentage Rent" as defined in this Section. The term "Lease Year" shall mean the period from the Commencement Date through the first December 31 following the Commencement Date, January 1 through December 31 for each subsequent full calendar year during the Term, and January 1 to the end of the Term for the final Lease Year. All Rent shall be paid when due without notice, offset, or deduction or for any reason.

Please Initial

Landlord          Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 6 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

### (a)    Base Rent

The initial monthly Base Rent during the Term ("Base Rent") shall be *$0, rent shall be abated starting from tenant's possession of the space until May 31, 2013. Tenant shall begin paying $4,700.00 per month on June 1, 2013. Annual rent shall increase each year at the one year anniversary of rent commencement by Three (3%) percent.*

| Effective Date of Rent Increase | New Monthly Base Rent |
| --- | --- |
| *June 1*, 20*13* | $*4,700.00* |
| *June 1*, 20*14* | $*4,841.00* |
| *June 1*, 20*15* | $*4,984.35* |
| *June 1*, 20*16* | $*5,134.75* |
| *June 1*, 20*17* | $*5,289.89* |

Base Rent shall be paid in advance on or before the first (1st) day of each calendar month during the Term, except for the first (1st) calendar month. Upon execution of this Lease, Tenant shall pay to Landlord Base Rent for the first (1st) full calendar month of the Term which is set forth on the Summary of Fundamental Provisions. If the first (1st) month of the Term shall be a partial month, Base Rent shall be prorated on a daily basis, based on the actual number of days in such month, and the amount due for such partial month shall be paid on or before the first (1st) day of the first (1st) full calendar month following the Commencement Date.

### (b)    ~~Percentage Rent~~

~~Percentage Rent shall be an amount equal to _____ percent (_____%) of Tenant's "Gross Sales," as defined below, for each Lease Year, less any Base Rent actually paid by Tenant during the Lease Year. Percentage Rent, when applicable, shall be paid on or before the tenth (10th) day of each month during the Lease Year, with an adjustment at the end of each Lease Year as provided below. On or before the tenth (10th) day of each month during the Term, except for the initial month of the Term, Tenant shall pay to Landlord an amount equal to the percentage set forth above of Gross Sales in the previous calendar month, less the Base Rent actually paid by Tenant for the previous calendar month. The excess over the Base Rent shall be paid by Tenant to Landlord simultaneously with the delivery of the statement of monthly Gross Sales pursuant to the terms of Section 2(c) below.~~

### (c)    ~~Statement of Gross Sales~~

~~On or before the tenth (10th) day of each month, whether or not any Percentage Rent is payable, Tenant shall deliver to Landlord a complete and correct statement showing in reasonable detail all Gross Sales for the immediately preceding calendar month, which statement shall be signed by an officer or authorized agent of Tenant certifying it to be true and accurate. On or before the forty-fifth (45th) day after the end of each Lease Year during the Term, Tenant shall deliver to Landlord a complete and correct statement showing in reasonable detail all Gross Sales for such Lease Year and the amount of Base Rent and Percentage Rent actually paid for such Lease Year, which statement shall be signed by an officer or authorized agent of Tenant certifying it to be true and accurate. Simultaneously with the delivery of such statement for the Lease Year, Tenant shall pay to Landlord the additional Percentage Rent, if any, required to be paid hereunder. Any excess Rent payment by Tenant for the Lease Year shall be applied to Tenant's next succeeding payment of Rent or other charges under the Lease (provided, however, that if no further payment is owed, said excess Rent payment shall be paid to Tenant within thirty (30) days after receipt of such statement) unless within thirty (30) days after the receipt of such statement, Landlord requests an audit as provided herein. Within fifteen (15) days after Tenant's income tax returns are filed, the preparer of~~

Please Initial

Landlord     Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 7 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

~~Tenant's income tax return shall furnish Landlord with a signed statement certifying the amount of Gross Sales reported in Tenant's income tax returns attributable to the Premises.~~

~~(d)     Records of Gross Sales~~

~~Tenant shall keep complete and proper books of account and other records pertaining to Gross Sales on a monthly basis. The books and records shall be kept or made available at a location reasonably accessible to Landlord, who may inspect all such books and records at all reasonable times to verify Tenant's Gross Sales. Tenant shall utilize cash registers equipped with sealed, continuous totals to record all Gross Sales. Such cash register tapes shall be available for Landlord's review with Tenant's other books and records. Within three (3) years after each statement of Gross Sales for a Lease Year is due, whether or not it has been submitted or whether or not Landlord has accepted a deficiency payment or refunded an excess, Landlord may request an audit of Tenant's Gross Sales by an independent certified public accountant chosen by Tenant from a list of not fewer than three (3) submitted by Landlord in connection with the request. If Tenant does not make the choice within five (5) days, Landlord may do so. The auditor shall have access to all Tenant's books and records and shall take such steps as the auditor deems necessary to complete the audit. The auditor's report shall be final and binding upon Landlord and Tenant and payments required to make adjustments in Percentage Rent to conform to the report shall be made within ten (10) days after receipt of the report. If the Gross Sales for any Lease Year audited shall be found by the auditor to be understated by more than two percent (2%), Tenant shall immediately pay Landlord the cost of such audit; otherwise, the cost of such audit shall be paid by Landlord.~~

~~(e)     Definition of Gross Sales~~

~~The term "Gross Sales" shall include all money and things of value received by, or paid to, Tenant or to others for Tenant's use and benefit, and all credit extended by Tenant in connection with the business conducted by it on the Premises and including sales of goods or services by any concessionaire, subtenant, or licensee and sales through vending devices (except as hereinafter qualified); less any sales taxes or excise taxes based upon sales price collected from customers and for which Tenant is accountable to any government or governmental agency, and less the amount of any actual refunds or credits made by Tenant on returnable merchandise. Gross Sales shall include any discount paid or payable to any firm or person for the use of any credit system or credit card service. Gross Sales shall include all proceeds received from any vending machines owned by Tenant or by any firm or person which is a subsidiary, affiliate, or parent of Tenant. Gross Sales shall include only the proceeds ultimately received by Tenant as commissions or otherwise in connection with vending machines that are not owned by Tenant nor owned by any firm or person who is a subsidiary, affiliate, or parent of Tenant, provided that such vending machines do not produce a substantial portion of Tenant's business. All sales originating at, on, or from the Premises and all electronic, catalog, or Internet sales made from the Premises, and all such sales made by Tenant within _____ (\_\_\_\_\_) miles of the Premises shall be considered as made and completed therein, even though bookkeeping and payment of the account may be transferred to another place for collection and even though actual filling of the sale or order and actual delivery thereof may be made from a place other than the Premises.~~

### (f)     No Partnership Created

Landlord is not by virtue of this Section 2 a partner or joint venturer with Tenant in connection with the business carried on under this Lease, and shall have no obligation with respect to Tenant's debts or other liabilities.

### (g)     General

All references to "Rent" or "Rental" in this Lease shall mean Base Rent, Percentage Rent, Additional Rent, and all other payments required of Tenant under this Lease, unless otherwise expressly specified, and all payments required by Tenant under this Lease shall be deemed "Rent."

Please Initial

Landlord     Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 8 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

### (h) Place of Payment

Tenant shall pay Rent and other amounts required to be paid by Tenant hereunder to Landlord at the address for Landlord set forth on the Summary of Fundamental Provisions of this Lease, or at such other place as Landlord may from time to time designate in writing.

### (i) Prepaid Rent

Upon the execution of this Lease, Tenant shall pay to Landlord the prepaid rent set forth on the Summary of Fundamental Provisions. Landlord's obligations with respect to the prepaid rent are those of a debtor and not of a trustee, and Landlord shall be entitled to commingle the prepaid rent with Landlord's general funds. Landlord shall not be required to pay Tenant interest on the prepaid rent. Landlord shall be entitled to immediately endorse and cash Tenant's prepaid rent; however, such endorsement and cashing shall not constitute Landlord's acceptance of this Lease. In the event Landlord does not accept this Lease, Landlord shall promptly return said prepaid rent to Tenant.

## 3. SECURITY DEPOSIT

Upon execution of this Lease, Tenant shall pay to Landlord a sum equal to the amount set forth on the Summary of Fundamental Provisions, Landlord shall be entitled to apply the Security Deposit to pay the cost of repairing any damage caused by Tenant, or performing any obligation which Tenant fails to perform within the time required by this Lease, but such application by Landlord shall not waive Landlord's other remedies nor be the exclusive remedy for Tenant's default. Such security deposit shall be returned to Tenant within thirty (30) days after the expiration of this Lease, provided Tenant has fully and faithfully carried out all of Tenant's obligations hereunder, including the payment of all amounts due to Landlord hereunder and the surrender of the Premises to Landlord in the condition required in this Lease. However, Landlord, at its option, may apply such sum on account of the payment of the last month's Base Rent or other unpaid Tenant obligations, in which latter event, Tenant shall replace any such sum applied by Landlord immediately upon notice from Landlord of such requirement. Such sum may be commingled with other funds of Landlord and shall not bear interest. In the event of a sale of the Property, Landlord shall have the right to transfer the security deposit to the purchaser to be held under the terms of this Lease, and Landlord shall thereupon be released from all liability for the return of the security deposit. Tenant agrees to look solely to the new landlord for the return of the security deposit.

## 4. ADDITIONAL RENT

### (a) Operating Expenses

In addition to Base Rent, Tenant shall pay to Landlord a proportionate share of the Operating Expenses incurred by Landlord in connection with the Property. The term "Operating Expenses" shall mean all expenses paid or incurred by Landlord or on Landlord's behalf, as reasonably determined by Landlord to be necessary or appropriate for the efficient operation, management, maintenance, and repair of the land and the Building. Operating Expenses shall also include the cost of any capital improvement to the Property or Building, amortized with a reasonable finance charge over the shorter period of (i) its useful life or (ii) the longest period during which the cost can be amortized under applicable tax laws; provided, however, that such capital improvements shall include only roof, heating, air conditioning, and sprinkler systems, and those that are required by applicable building codes or laws, or those that Landlord reasonably believes will improve the operating efficiency of the Building or the Property. Operating Expenses shall also include a reasonable management fee to be paid by Tenant to Landlord in an amount equal to Landlord's total management fee multiplied by Tenant's share of Operating Expenses for the retail areas of the Building. Tenant shall pay to Landlord an amount each month which is equal to one-half (1/2) of the estimated Annual Operating Expenses, as provided in Section 4(c) below. Tenant's Proportionate Share of Operating Expenses shall equal *Twenty* percent (*20*%) of those Operating Expenses applicable to the retail areas of the Building and *Twenty* percent (*20*%) of those Operating Expenses applicable to the Property and the Building in general. Landlord may reasonably modify Tenant's Proportionate Share of the Retail Area and/or the Building Area if the Retail Area

Please Initial

Landlord  Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 9 of 48

Case 13-03291-elp   Doc 12   Filed 01/10/14

and/or the Building Area is increased or decreased, as the case may be. Landlord shall allocate Operating Expenses to the retail areas in the Building and to the Property and the Building in general, in Landlord's reasonable discretion.

### (b) Property Taxes and Insurance

In addition to Base Rent, Tenant shall pay *twenty* percent (*20*%) of all real property taxes and assessments levied, assessed, or imposed during the Term upon the Property ("Taxes") and *twenty* percent (*20*%) of the costs of insurance provided by Landlord pursuant to Section 5(a) ("Insurance"). Tenant shall pay to Landlord an amount each month which is equal to one-twelfth (1/12) of the estimated annual Taxes and Insurance together with Tenant's payments of Operating Expenses, as provided in Section 4(c) below. If, during the Term, the voters of the state in which the Premises are located or the state legislature enacts a real property tax limitation, then any substitute taxes, in any name or form, that may be adopted during the Term to replace or supplement real property taxes, shall be added to Taxes for purposes of this Section 4(b). Should there be in effect during the Term any law, statute, or ordinance that levies, assesses, or imposes any tax (other than federal or state income tax) upon rents, Tenant shall pay such taxes as may be attributable to the Rents under this Lease or shall reimburse Landlord for any such taxes paid by Landlord within ten (10) days after Landlord bills Tenant for the same.

### (c) Payment of Operating Expenses, Taxes and Insurance

Landlord shall notify Tenant of Tenant's required estimated monthly payments of Operating Expenses, Taxes, and Insurance. Beginning on the Commencement Date, and continuing throughout the Term, Tenant shall make such monthly payments on or before the first (1st) day of each calendar month. Landlord may, from time to time, by written notice to Tenant, change the estimated monthly amount to be paid. No interest or earnings shall be payable by Landlord to Tenant on any amount paid under this Section 4, and Landlord may commingle such payments with other funds of Landlord. Landlord shall, within ninety (90) days after the close of each calendar year or as soon thereafter as is practicable, deliver to Tenant a written statement setting forth the actual Operating Expenses, Taxes, and Insurance for the prior year together with a computation of the charge or credit to Tenant of any difference between the actual cost and the estimated cost paid by Tenant for such period; and any such difference shall be applied to amounts subsequently due from Tenant to Landlord, or if no such sums are or will be owed, then such sums shall be paid or reimbursed, as applicable, within ten (10) days after Landlord gives Tenant notice thereof. If Tenant has any objections to the annual statement made by Landlord, such objections shall be made in writing given to Landlord within thirty (30) days after the statement is submitted to Tenant. If no objection is made within such time period, the annual statement shall be conclusive and binding on Tenant. If Tenant desires to review any of Landlord's records pertaining to Operating Expenses, Taxes, or Insurance, Tenant may do so after reasonable prior notice given to Landlord, but no more often that once during any calendar year. Such review shall take place where such records are kept, and shall be conducted by a certified public accountant chosen by Tenant subject to Landlord's prior written approval, which shall not be unreasonably withheld. Tenant shall pay all costs of such review including without limitation reimbursement for time incurred by Landlord's representatives and photocopy charges.

## 5. INSURANCE; INDEMNITY

### (a) Insurance

During the Term, Landlord shall maintain in full force a policy or policies of standard multi-peril insurance covering the Building and other improvements (exclusive of Tenant's trade fixtures, tenant improvements and other property) situated on the Property for the perils of fire, lightening, windstorm, and other perils commonly covered in such policies. Additionally, the perils of earthquake, landslide, flood, and/or other perils may be covered at the election of Landlord. During the Term, Landlord shall maintain in full force a comprehensive liability insurance policy in amounts considered appropriate by Landlord insuring Landlord against liability for bodily injury and property

Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 10 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

damage occurring in, on, or about the Property. Landlord shall use its reasonable efforts to secure said insurance at competitive rates.

### (b)  Increases in Premiums

This Lease is entered into on the basis that Tenant's occupancy will not affect the Property's classification for insurance rating purposes. If the insurance premiums on the Property are increased during the Term as a result of the installation of equipment on the Premises by Tenant, by reason of Tenant's maintaining certain goods or materials on the Premises, or as a result of other use or occupancy of the Premises by Tenant, Tenant shall pay the additional cost of the insurance for any such buildings (whether or not Landlord has consented to the activity resulting in the increased insurance premiums). Tenant shall refrain from any activity in its use of the Premises that would make it impossible to insure the Premises or the buildings situated on the Property against casualty or that would increase the insurance rate of any such buildings or prevent Landlord from taking advantage of the ruling of the Insurance Rating Bureau of the state in which the Premises are situated or its successors allowing Landlord to obtain reduced premium rates for long-term fire insurance policies, unless Tenant pays the additional cost of the insurance. All of Tenant's electrical equipment shall be U-L approved. If Tenant installs any electrical equipment that overloads the lines in the Premises or in any such buildings, Tenant shall at its own expense make whatever changes are necessary to comply with the requirements of the insurance underwriters and governmental authorities having jurisdiction. Any insurance premiums to be paid by Tenant by reason of its initial intended use of the Premises or any increase in fire insurance premiums attributable to Tenant's use or occupancy of the Premises during the Term shall be paid by Tenant to Landlord within thirty (30) days after Landlord bills Tenant for the same.

### (c)  Indemnity; Tenant's Insurance

Tenant shall indemnify, defend, and save harmless Landlord from any and all liability, damage, expenses, attorneys' fees, causes of actions, suits, claims, or judgments, arising out of or connected with (i) the use, occupancy, management, or control of the Premises, (ii) any failure of Tenant to comply with the terms of this Lease, and (iii) the acts or omissions of Tenant, its agents, officers, directors, employees, or invitees; provided, however, that Tenant shall not be liable for claims caused by the sole negligence of Landlord. Tenant shall, at its own cost and expense, defend any and all suits that may be brought against Landlord either alone or in conjunction with others upon any such above-mentioned cause or claim, and shall satisfy, pay, and discharge any and all settlements paid by or judgments that may be entered against Landlord, regardless of whether a lawsuit is actually filed. Tenant shall at its own expense during the Term carry in full force and effect (a) a comprehensive public liability insurance policy with limits of not less than Two Million Dollars ($2,000,000) combined single limit bodily injury and property damage per occurrence and in aggregate, and (b) a business automobile liability insurance covering owned, non-owned, and hired vehicles with a limit of not less than One Million Dollars ($1,000,000), with an insurance carrier satisfactory to Landlord, naming Landlord, Landlord's management agent, and Landlord's lender as additional insureds. Said insurance policies shall insure against any and all liability of Tenant with respect to the Premises and under this Lease including, without limitation, Tenant's indemnity obligations under this Lease, or arising out of the maintenance, use, or occupancy of the Premises. Tenant shall carry insurance that fully covers repair and replacement of broken storefront windows. If engaged in the sale or distribution of alcoholic beverages, Tenant shall carry liquor liability insurance in a form and in such amounts satisfactory to Landlord. Such policy shall provide that the insurance shall not be cancelable or modified without at least thirty (30) days' prior written notice to Landlord, Landlord's lender and Landlord's managing agent, if any, and shall be deemed primary and noncontributing with other insurance available to Landlord. On or before the Commencement Date, Tenant shall furnish Landlord with a certificate or other acceptable evidence that such insurance is in effect. Tenant shall also provide and maintain insurance to comply with Workers Compensation and Employers Liability Laws.



Standard Form of RETAIL LEASE
Page 8

Please Initial

Landlord    Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 11 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

## 6. USE OF PREMISES

The Premises shall be used for ***sports themed pub; selling food and ancillary thereto sale of alcohol and lottery items*** and for no other purpose without Landlord's written consent. In connection with the use of Premises, Tenant shall, at Tenant's sole cost and expense, except as specifically provided otherwise herein:

a) Conform to all applicable laws, statutes, rules, ordinances, orders, regulations, and requirements of any public authority ("Laws") affecting the Premises and the use of the Premises and correct, at Tenant's own expense, any failure of compliance created through Tenant's fault or by reason of Tenant's use, unless such failure is due to Landlord's default in the performance of the agreements set forth in this Lease to be kept and performed by Landlord. Without limiting the generality of the foregoing, Tenant shall comply with the Americans with Disabilities Act as it applies to the Premises and all obligations pertaining to asbestos as required by the Occupational Safety and Health Administration (OSHA) applicable to the Premises and to Tenant's employees. If Tenant's permitted use includes operating as a "dry cleaning facility" as defined under ORS 465.515, then Tenant shall take all steps necessary to obtain exemption from administrative and judicial action and exemption from liability under ORS 465.503, as may be amended;

b) Refrain from any activity that would be unreasonably offensive to Landlord, to other tenants in any buildings situated on the Property, or to owners or users of the adjoining premises, or that would tend to create a nuisance or damage the reputation of the Premises or of any such buildings. Without limiting the generality of the foregoing, Tenant shall not permit any noise or odor to escape or be emitted from the Premises nor permit the use of flashing (strobe) lights nor permit the sale or display of offensive materials as reasonably determined by Landlord;

c) Refrain from loading the floors, electrical systems, plumbing systems, or heating, ventilating and air conditioning systems ("HVAC"), beyond the point considered safe by a competent engineer or architect selected by Landlord and refrain from using electrical, water, sewer, HVAC, and plumbing systems in any harmful way. If Landlord employs an engineer, architect, electrical, or other consultant to determine whether Tenant's use of the Premises is in violation of this Section 6(c), Tenant shall pay the reasonable costs incurred in connection with that employment. Tenant shall use hair interceptors, grease traps, or other drain protection devices as needed to avoid such harmful use;

d) Not permit any pets or other animals in the Premises except for Seeing Eye dogs;

e) Refrain from making any marks on or attaching any sign, insignia, antenna, window covering, aerial, or other device to the exterior or interior walls, windows, or roof of the Premises without the written consent of Landlord, which consent shall not be unreasonably withheld. Landlord need not consent to any sign that fails to conform to the design concept of the buildings situated on the Property, and all policies and procedures as established by Landlord. Prior to installing any signs, Tenant shall submit detailed color drawings to Landlord for approval indicating the location, size, layout, design, and color of proposed sign, including all lettering and graphics. Electrical service to all signs shall be at Tenant's sole expense. Free standing or monument signs are prohibited. Notwithstanding Landlord's consent to any signs, Tenant shall (i) comply with all Laws and obtain any necessary permits and governmental approvals related to such signs at its own cost and expense, and (ii) within fifteen (15) days after Lease expiration or earlier termination, remove all such signs and repair any damage to the Premises caused thereby, at Tenant's own cost and expense; Tenant shall be permitted one 2 sided panel on monument sign. *(R.B)*

f) Comply with any reasonable rules respecting the use of the Premises promulgated by Landlord from time to time and communicated to Tenant in writing. Without limiting the generality of the foregoing, such rules may establish hours during which the common area shall be open for use, may regulate deliveries to the Premises and may regulate parking by employees. Recognizing that it is in the best interests of all tenants to

Please Initial

Landlord   Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 12 of 48

Case 13-03291-elp   Doc 12   Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

accommodate the parking needs of customers, Landlord reserves the right to require employees of Tenant to park in designated areas of the common area or to park outside of the common area if Landlord determines that the extent of employee parking is detrimental to the businesses of the tenants or any of them. Tenant shall use its best efforts to complete, or cause to be completed, all deliveries, loading and unloading, to the Premises by *11* a.m. each day, and to prevent delivery trucks or other vehicles serving the Premises to park or stand in front of the locations of other tenants;

g)   Comply with any no smoking (and other health related) policies and procedures established by any Law or by Landlord from time to time;

h)   Recognize that it is in the interest of both Tenant and Landlord to have regulated hours of business, Tenant shall keep the Premises open for business and cause Tenant's business to be conducted therein during those days and hours as is customary for businesses of like character in the city or county in which the Premises are situated, but in any event during those days and hours reasonably established by Landlord which, at the Commencement Date, shall be *7:30* a.m. to *2:30* a.m. Monday through Saturday and *7:30* a.m. to *2:30* a.m. Sundays, and Tenant shall be entitled to remain closed on legal holidays. Any failure to operate by Tenant shall be excused to the extent that the use of the Premises is interrupted or prevented by causes beyond Tenant's reasonable control; provided, however, that Tenant's financial condition, poor market demand for Tenant's products, and other economic factors shall not excuse Tenant's obligation to continuously operate as required under this section;

i)   Maintain on the Premises an adequate stock of merchandise and trade fixtures to service and supply the usual and ordinary requirements of its customers. If Tenant has a food or beverage related use, Tenant shall not use a substantially new or modified menu without Landlord's prior review and written approval of the menu, which shall not be unreasonably withheld;

j)   Not permit any cash, credit card, or coin-operated vending, novelty, or gaming machines or equipment on the Premises without the prior written consent of Landlord; and not permit the use of any part of the Premises for a second-hand store, an auction, distress, fire sale, bankruptcy, or going-out-of-business sale or the like;

k)   Refrain from violating or causing the violation of any exclusive use provision granted to any tenant or other occupant of the Property as to which Tenant has been given written notice;

l)   Not commit or suffer any harm to the Premises, including without limitation, the improvements thereon or any part thereof; and Tenant shall keep the Premises in a neat, clean, sanitary, and orderly condition;

m)   Refrain from any use of any area on the Property that is outside the Premises, unless such use is specifically permitted in writing by Landlord in advance;

n)   Not generate, release, store, or deposit on the Premises any environmentally hazardous or toxic substances, materials, wastes, pollutants, oils, or contaminants, as defined or regulated by any federal, state, or local law or regulation or any other Law (collectively, "Hazardous Substances"), except that Tenant may have and use small quantities of Hazardous Substances on the Premises as required in the ordinary course of Tenant's business. Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all claims, losses, damages, response costs, and expenses of any nature whatsoever (including without limitation attorneys', experts', and paralegals' fees) arising out of or in any way related to the generation, release, storage, or deposit of Hazardous

Please Initial

R.B
Landlord   Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 13 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

Substances on the Premises or on Landlord's property by Tenant or any other person or entity other than Landlord on and/or after the date of this Lease;

    o)    Not allow or permit any conduct or omission at the Premises, or anywhere on Landlord's property, that will promote or allow the production or growth of mold, spores, fungus, or any other similar organism, and shall indemnify and hold Landlord harmless from any claim, demand, cost, and expense (including attorney fees) arising from or caused by Tenant's failure to strictly comply with its obligations under this provision; and

    p)    Comply with the requirements of all operation and easement agreements and all other agreements and requirements of record on the Property.

## 7.    TENANT IMPROVEMENTS AND ALTERATIONS

Unless otherwise specified in any Rider or Exhibit to this Lease, Tenant accepts the Premises AS IS in their condition as of the Commencement Date and Tenant shall pay for all tenant improvements, whether the work is performed by Landlord or by Tenant. If any improvements or alterations to the Premises or any other work on the Premises by Tenant causes the need to comply with any Laws in areas outside of the Premises including without limitation the Americans with Disabilities Act or regulations pertaining to earthquake codes, Tenant shall pay the cost thereof as well. Tenant shall make no improvements or alterations on the Premises of any kind, including the initial work to be performed by Tenant in the Premises, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Prior to the commencement of any work by Tenant, Tenant shall first submit the following to Landlord and obtain Landlord's written consent to all of the following, which consent shall not be unreasonably withheld: Tenant's plans and specifications; Tenant's estimated costs; and the names of all of Tenant's contractors and subcontractors. If Landlord is to perform the work for some or all of such work, Landlord shall have the right to require Tenant to pay for the cost of the work in advance or in periodic installments. If the work is to be performed by Tenant, Landlord shall have the right to require Tenant to furnish adequate security to assure timely payment to the contractors and subcontractors for such work. All work performed by Tenant shall be done in strict compliance with all applicable building, fire, sanitary, and safety codes, and other Laws, and Tenant shall secure all necessary permits for the same. Tenant shall keep the Premises free from all liens in connection with any such work. All work performed by Tenant shall be carried forward expeditiously, shall not interfere with Landlord's work or the work to be performed by or for other tenants, and shall be completed within a reasonable time. Landlord or Landlord's agents shall have the right at all reasonable times to inspect the quality and progress of such work. All improvements, alterations, and any other work performed on the Premises by either Landlord or Tenant shall be the property of Landlord when installed, except for Tenant's trade fixtures, and may not be removed at the expiration of this Lease unless the applicable Landlord's consent specifically provides otherwise. Notwithstanding Landlord's consent to improvements or alterations by Tenant, all such improvements, alterations, or other work to be performed by Tenant shall be at the sole cost and expense of Tenant.

## 8.    REPAIRS AND MAINTENANCE

    (a)    **Landlord's Responsibilities**

The following shall be the responsibility of Landlord, provided that the cost thereof shall be recoverable by Landlord as Operating Expenses to the extent provided in Section 4(a):

    i.    Structural repairs and maintenance and repairs necessitated by structural disrepair or defects;



Standard Form of RETAIL LEASE
Page 11

Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 14 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

      ii.     Repair and maintenance of the exterior walls, roof, gutters, downspouts, and foundation of the Building. This shall not include maintenance of the operating condition of doors and windows or replacement of glass, nor maintenance of the storefront; and

      iii.    Repair of interior walls, ceilings, doors, windows, floors, and floor coverings when such repairs are made necessary because of failure of Landlord to keep the structure in repair as above provided in this Section 8(a).

    (b)    **Tenant's Responsibilities**

The following shall be the responsibility of Tenant:

      i.     The interior of the Premises including any interior decorating;

      ii.     Any repairs and replacements necessitated by the negligence or use of the Premises by Tenant, its agents, employees, and invitees;

      iii.    Maintenance, repair, and replacement of the HVAC systems and sprinkler systems, if any; however, Landlord reserves the right to contract with a service company for the maintenance and repair of the foregoing systems, or any of them; and Tenant's share of such expenses shall be paid by Tenant to Landlord monthly;

      iv.    Maintenance and repair of the interior walls and floor coverings (both hard surfaces and carpeting);

      v.     Any repairs or alterations required under Tenant's obligation to comply with all applicable Laws as set forth in this Lease; and

      vi.    All other repairs, maintenance, and replacements to the Premises which Landlord is not expressly required to make under Section 8(a) above, including, without limitation, the generality of the foregoing, the replacement of all glass that may be broken or cracked during the Term with glass of as good or better quality than that in use at the commencement of the Term, the storefront, wiring, plumbing, drainpipes, sewers, and septic tanks, including without limitation, repairs outside the Premises if the need for the repair arises from Tenant's use of the Premises. All Tenant's work shall be in full compliance with then current building code and other governmental requirements. Tenant shall contract with a qualified pest extermination company for regular extermination services to keep the Premises free of pests, vermin, and rodents.

    (c)    **Inspections**

Landlord shall have the right to inspect the Premises at any reasonable time or times to determine the necessity of repair. Whether or not such inspection is made, the duty of Landlord to make repairs as outlined above in any area in Tenant's possession and control shall not mature until a reasonable time after Landlord has received from Tenant written notice of the necessity of repairs, except in the event emergency repairs may be required and in such event Tenant shall attempt to give Landlord immediate notice considering the circumstances.

    (d)    **Landlord's Work**

All repairs, replacements, alterations, or other work performed on or around the Premises by Landlord shall be done in such a way as to interfere as little as reasonably possible with the use of the Premises by Tenant. Tenant shall

Standard Form of RETAIL LEASE
Page 12

Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 15 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

have no right to an abatement of Rent nor any claim against Landlord for any inconvenience or disturbance resulting from Landlord's performance of repairs and maintenance pursuant to this Section 8. Landlord shall have no liability for failure to perform required maintenance and repair, unless written notice of such maintenance or repair is given by Tenant and Landlord fails to commence efforts to remedy the problem in a reasonable time and manner. Landlord shall have the right to erect scaffolding and other apparatus necessary for the purpose of making repairs or alterations to the Building. Work may be done during normal business hours. Tenant shall have no claim against Landlord for any interruption or reduction of services or interference with Tenant's occupancy caused by Landlord's maintenance and repair, and no such interruption or reduction shall be construed as a constructive or other eviction of Tenant.

## 9.    LIENS; TENANT'S TAXES

Tenant shall keep the Premises free from all liens, including mechanic's liens, arising from any act or omission of Tenant or those claiming under Tenant. Landlord shall have the right to post and maintain on the Premises or the Building such notices of nonresponsibility as are provided for under the lien laws of the state in which the Premises are located. Tenant shall be responsible for and shall pay when due all taxes assessed during the Term against any leasehold or personal property of any kind owned by or placed upon or about the Premises by Tenant.

## 10.    UTILITIES AND SERVICES

Tenant shall pay promptly for all water and sewer facilities, gas and electrical services, including heat and light, garbage collection, recycling, and all other facilities and utility services used by Tenant or provided to the Premises during the Term. If the heating and air-conditioning systems or any other utility service is not on separate meters, Tenant shall pay its proportionate share of such charges as reasonably determined by Landlord provided in Section 4(a) of this Lease. Tenant shall arrange for regular and prompt pickup of trash and garbage and shall store such trash and garbage in only those areas designated by Landlord. However, if Landlord elects to arrange for garbage collection on a cooperative basis for Tenant and other tenants, Tenant shall pay its proportionate share as reasonably determined by Landlord as provided in Section 4(a) of this Lease. Tenant shall comply with any recycling programs required by any Law or reasonably required by Landlord. Landlord shall not be liable or responsible for any interruption of utility service to the Premises and any such interruption shall not entitle Tenant to any abatement of rent, unless such interruption is caused solely by the negligence of Landlord.

## 11.    ICE, SNOW, AND DEBRIS

Tenant shall keep the walks in front of the Premises free and clear of ice, snow, rubbish, debris, and obstructions. Tenant shall indemnify and hold Landlord harmless from any injury whether to Landlord or Landlord's property or to any other person or property caused by Tenant's failure to perform Tenant's obligations under this Section 11. Tenant's obligations under this Section 11 shall be performed at Tenant's cost and expense. Landlord reserves the right to cause the removal of ice, snow, debris and obstruction from the area in front of the Premises and Tenant shall pay the cost thereof within ten (10) days after billing therefor.

## 12.    WAIVER OF SUBROGATION

Neither party shall be liable to the other for any loss or damage caused by fire or any of the risks enumerated in a standard multiperil insurance policy, including sprinkler leakage insurance if the Premises have sprinklers, to the extent that any such insurance actually pays any such loss or damage. All claims or rights of recovery for any and all such loss or damage, however caused, are hereby waived. Without limiting the generality of the foregoing, said absence of liability shall exist whether or not such loss or damage is caused by the negligence of either Landlord or Tenant or by any of their respective agents, servants, or employees.

## 13.    INJURY TO TENANT'S PROPERTY

Landlord shall not be liable for any injury to the goods, stock, merchandise, or any other property of Tenant or to any person in or upon the Premises or to the leasehold improvements in the Premises resulting from fire or collapse of the Building or any portion thereof or any other cause, including but not limited to damage by water or gas, or by

Please Initial

Landlord     Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 16 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

reason of any electrical apparatus in or about the Premises. Tenant shall carry adequate insurance coverage at its sole cost and expense to cover the risks described in this section.

14. **DAMAGE OR DESTRUCTION**

    (a)    **Partial Destruction**

If the Premises shall be partially damaged by fire or other cause, and Section 14(b) below does not apply, the damages to the Premises shall be repaired by Landlord, and all Base Rent until such repair shall be made shall be apportioned according to the part of the Premises that is usable by Tenant, except when such damage occurs because of the fault of Tenant. The repairs shall be accomplished with all reasonable dispatch. Landlord shall bear the cost of such repairs, unless the damage occurred from a risk that would not be covered by a standard fire insurance policy with an endorsement for extended coverage, including sprinkler leakage, and the damage was the result of the fault of Tenant, in which event Tenant shall bear the expense of the repairs.

    (b)    **Substantial Damage**

If the buildings situated on the Property or the Building or the Premises, or any of them, are twenty-five percent (25%) or more destroyed during the Term by any cause, Landlord may elect to terminate the Lease as of the date of damage or destruction by notice given to Tenant in writing not more than sixty (60) days following the date of damage. In such event all rights and obligations of the parties shall cease as of the date of termination. In the absence of an election to terminate, Landlord shall proceed to restore the Premises, if damaged, to substantially the same form as prior to the damage or destruction, so as to provide Tenant usable space equivalent in quantity and character to that before the damage or destruction. Work shall be commenced as soon as reasonably possible, and thereafter proceed without interruption, except for work stoppages on account of matters beyond the reasonable control of Landlord. From the date of damage until the Premises are restored or repaired, Base Rent shall be abated or apportioned according to the part of the Premises usable by Tenant, unless the damage occurred because of the fault of Tenant. Landlord shall bear the cost of such repairs unless the damage occurred from a risk that would not be covered by a standard fire insurance policy with an endorsement for extended coverage, including sprinkler leakage, and the damage was the result of the fault of Tenant, in which event Tenant shall bear the expense of the repairs.

    (c)    **Restoration**

If the Premises are to be restored by Landlord as above provided in this Section 14, Tenant, at its expense, shall be responsible for the repair and restoration of all items that were initially installed at the expense of Tenant (whether the work was done by Landlord or Tenant) or for which an allowance was given by Landlord to Tenant, together with Tenant's stock in trade, trade fixtures, furnishings, and equipment; and Tenant shall commence the installation of the same promptly upon delivery to it of possession of the Premises and Tenant shall diligently prosecute such installation to completion.

15. **EMINENT DOMAIN**

    (a)    **Partial Taking**

If a portion of the Premises is condemned and neither Section 15(b) nor Section 15(c) apply, the Lease shall continue in effect. Landlord shall be entitled to all the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of condemnation. Landlord shall proceed as soon as reasonably possible to make such repairs and alterations to the Premises as are necessary to restore the remaining Premises to the condition as comparable as reasonably practicable to that existing at the time of condemnation. Base Rent shall be abated to the extent that the Premises are untenantable during the period of alteration and repair. After the date on which title vests in the condemning authority, Base Rent shall be reduced commensurately with the reduction in the objective value of the Premises as an economic unit on account of the partial taking.

Standard Form of RETAIL LEASE
Page 14

Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 17 of 48

Standard Form of RETAIL LEASE

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

### (b)   Substantial Taking of the Property

If a condemning authority takes any substantial part of the Property or any substantial part of the Building, the Lease shall, at the option of Landlord, terminate as of the date title vests in the condemning authority. In such event all rights and obligations of the parties shall cease as of the date of termination. Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation. Tenant shall be free to make a separate claim for its moving expenses and lost trade fixtures so long as such claim does not interfere with or reduce Landlord's claim or award.

### (c)   Substantial Taking of Premises

If a condemning authority takes all the Premises or a portion sufficient to render the remaining Premises reasonably unsuitable for Tenant's use, Tenant shall have the option to terminate the Lease upon written notice to Landlord given within sixty (60) days of Tenant's receipt of notice of the taking. In such event, the Lease shall terminate as of the date title vests in the condemning authority. Landlord shall be entitled to all the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation. Tenant shall be free to make a separate claim for its moving expenses and lost trade fixtures so long as such claim does not interfere with or reduce Landlord's claim or award.

### (d)   Definition

Sale of all or any part of the Premises to a purchaser with the power of eminent domain in the face of a threat or probability of the exercise of the power shall be treated for the purpose of the Lease as a taking by condemnation.

### 16.   BANKRUPTCY

Subject to Section 17, the Lease shall not be assigned or transferred voluntarily or involuntarily by operation of law. It may, at the option of Landlord, be terminated, if Tenant be adjudged bankrupt or insolvent, or makes an assignment for the benefit of creditors, or files or is a party to the filing of a petition in bankruptcy, or commits an act of bankruptcy, or in case a receiver or trustee is appointed to take charge of any of the assets of Tenant or sublessees or assignees in or on the Premises, and such receiver or trustee is not removed within thirty (30) days after the date of his appointment, or in the event of judicial sale of the personal property in or on the Premises upon judgment against Tenant or any sublessees or assignee hereunder, unless such property or reasonable replacement therefor be installed on the Premises. To the extent permitted by law, this Lease or any sublease hereunder shall not be considered as an asset of a debtor-in-possession, or an asset in bankruptcy, insolvency, receivership, or other judicial proceedings. This Lease shall be considered a lease of real property in a shopping center within the meaning of Section 365(b)(3) of the U.S. Bankruptcy Code.

### 17.   DEFAULT

The following shall be events of default:

a)     Failure of Tenant to pay any Rent when due or failure of Tenant to pay any other charge required under this Lease within ten (10) days after it is due.

b)     Failure of Tenant to execute the documents described in Section 21 or 23 within the time required under such Sections; failure of Tenant to provide or maintain the insurance required of Tenant pursuant to Section 5(c); or failure of Tenant to comply with any Laws as required pursuant to Section 6 within 24 hours after written demand by Landlord.

c)     Failure of Tenant to comply with any term or condition or fulfill any obligation of the Lease (other than the failures described in Section 17a) or 17b) above) within ten (10) days after written notice by Landlord specifying the nature of the default with reasonable particularity. If the default is of such nature that it cannot be completely remedied within the ten (10)-day period, this provision shall be complied with if Tenant begins correction of the default within the ten (10)-day period and thereafter proceeds with reasonable diligence and in

Standard Form of RETAIL LEASE
Page 15

Please Initial

Landlord   Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 18 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

good faith to effect the remedy as soon as practicable. Landlord shall not be obligated to give written notice for the same type of default more than twice; at Landlord's option, a failure to perform an obligation after the second (2nd) notice shall be an automatic event of default, without notice or any opportunity to cure.

    d)      The abandonment of the Premises by Tenant or the failure of Tenant for fifteen (15) days or more to occupy the Premises for one or more of the designated purposes of this Lease unless such failure is excused under other provisions of this Lease.

    e)      The bankruptcy or insolvency of Tenant or the occurrence of other acts specified in Section 16 of this Lease that give Landlord the option to terminate.

    f)      The assignment or subletting or purported assignment or subletting of Tenant's interest under this Lease in violation of Section 20.

## 18.      REMEDIES ON DEFAULT

In the event of a default, Landlord may, at Landlord's option, exercise any one or more of the rights and remedies available to a landlord in the state in which the Premises are located to redress such default, consecutively or concurrently, including the following:

    a)      Landlord may elect to terminate Tenant's right to possession of the Premises or any portion thereof by written notice to Tenant. Following such notice, Landlord may re-enter, take possession of the Premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages. To the extent permitted by law, Landlord shall have the right to retain the personal property belonging to Tenant that is on the Premises at the time of re-entry, or the right to such other security interest therein as the law may permit, to secure all sums due or that become due to Landlord under this Lease. Perfection of such security interest shall occur by taking possession of such personal property or otherwise as provided by law.

    b)      Following re-entry by Landlord, Landlord may relet the Premises for a term longer or shorter than the Term and upon any reasonable terms, including the granting of rent concessions to the new tenant. Landlord may alter, refurbish, or otherwise change the character or use of the Premises in connection with such reletting. Landlord shall not be required to relet for any use or purpose that Landlord may reasonably consider injurious to its property or to any tenant Landlord may reasonably consider objectionable. No such reletting by Landlord following a default by Tenant shall be construed as an acceptance of the surrender of the Premises. If rent received upon such reletting exceeds the Rent received under this Lease, Tenant shall have no claim to the excess.

    c)      Landlord shall have the right to recover from Tenant the following damages:

        i.      All unpaid or other charges for the period prior to re-entry, plus interest at the greater of fifteen percent (15%) per annum or a rate equal to five (5) percentage points in excess of the discount rate, including any surcharge on the discount rate, on ninety (90)-day commercial paper declared by the Federal Reserve Bank in the Federal Reserve District in which Portland, Oregon, is located on the date the charge was due (the "Interest Rate").

        ii.      An amount equal to the Rent lost during any period during which the Premises are not relet, if Landlord uses reasonable efforts to relet the Premises. If Landlord lists the Premises with a real estate broker experienced in leasing commercial property in the metropolitan area in which the Premises are located, such listing shall constitute the taking of reasonable efforts to relet the Premises.

Please Initial

Landlord      Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 19 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

      iii.     All costs incurred in reletting or attempting to relet the Premises, including but without limitation, the cost of clean-up and repair in preparation for a new tenant, including any improvements to the Premises and the cost of correcting any defaults or restoring any unauthorized alterations and the amount of any real estate commissions and advertising expenses.

      iv.     The difference between the Rent reserved under this Lease and the amount actually received by Landlord after reletting, as such amounts accrue.

      v.     Reasonable attorney fees and legal expenses incurred in connection with the default, whether or not any litigation is commenced.

      **d)**     Landlord may sue periodically to recover damages as they accrue throughout the Term and no action for accrued damages shall be a bar to a later action for damages subsequently accruing. To avoid a multiplicity of actions, Landlord may obtain a decree of specific performance requiring Tenant to pay the damages stated in Section 18c) above as they accrue. Alternatively, Landlord may elect in any one action to recover accrued damages, plus damages attributable to the remaining Term equal to the difference between the Rent under this Lease and the reasonable rental value of the Premises for the remainder of the Term.

      **e)**     In the event Tenant remains in possession following default and Landlord does not elect to re-enter, Landlord may recover all back Rent and other charges, and shall have the right to cure any nonmonetary default and recover the cost of such cure from Tenant, plus interest from the date of expenditure at the Interest Rate. In addition, Landlord shall be entitled to recover attorney fees reasonably incurred in connection with the default, whether or not litigation is commenced. Landlord may sue to recover such amounts as they accrue, and no one action for accrued damages shall bar a later action for damages subsequently accruing.

      **f)**     The foregoing remedies shall not be exclusive but shall be in addition to all other remedies and rights provided under applicable law, and no election to pursue one remedy shall preclude resort to another remedy.

19.    **SURRENDER AT EXPIRATION**

      **(a)**    **Condition of Premises**

Upon expiration of the Term or earlier termination, Tenant shall deliver all keys to Landlord and surrender the Premises in first-class condition and broom clean. Improvements, alterations, wiring, cables, or conduit constructed by or for Tenant shall not be removed or restored to the original condition unless the terms of Landlord's consent provides otherwise or unless Landlord requests Tenant to remove all or any of such improvements, alterations, wiring, cables, or conduit, in which event Tenant shall remove those designated by Landlord for removal and restore the Premises at Tenant's sole cost and expense. Depreciation and wear from ordinary use for the purpose for which the Premises were let need not be restored, but all repair for which Tenant is responsible shall be completed to the latest practical date prior to such surrender. Tenant's obligations under this Section 19 shall be subject to the provisions of Section 14 relating to damages or destruction.

      **(b)**    **Fixtures**

      i.     All fixtures placed upon the Premises during the Term, other than Tenant's trade fixtures, shall, at Landlord option, become the property of Landlord. Movable furniture, decorations, floor covering other than hard surface bonded or adhesively fixed flooring, curtains, drapes, blinds, furnishings and trade fixtures shall remain the property of Tenant if placed on the Premises by Tenant; provided, however, if Landlord granted Tenant an allowance for improvements, installation, floor coverings, curtains, drapes,

Please Initial

Landlord      Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 20 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

blinds or other items, such items shall at Landlord's option become the property of Landlord, notwithstanding the installation thereof by Tenant. *Upon delivery of premises, Tenant shall pay Landlord Fifteen Thousand and No/100 Dollars ($15,000.00) for existing furniture, fixtures, and equipment that are in place and described on the attached exhibit.*

   ii. If Landlord so elects, Tenant shall remove any or all fixtures, wiring, cables, or conduit that would otherwise remain the property of Landlord, and shall repair any damage resulting from the removal. If Tenant fails to remove such fixtures, wiring, cables, or conduit, Landlord may do so and charge the cost to Tenant with interest at the Interest Rate. Tenant shall remove all furnishings, furniture, and trade fixtures that remain the property of Tenant and shall repair any damage resulting from the removal. If Tenant fails to do so, this shall be an abandonment of the property, and following ten (10) days' written notice, Landlord may remove or dispose of it in any manner without liability. Tenant shall be liable to Landlord for the cost of removal and transportation to storage, with interest on all such expenses from the date of expenditure at the Interest Rate.

   iii. The time for removal of any property or fixtures that Tenant is required to remove from the Premises upon termination shall be as follows:

     (1) On or before the date the Lease terminates because of expiration of the Term or because of a default under Section 17.

     (2) Within ten (10) days after written notice from Landlord requiring such removal where the property to be removed is a fixture that Tenant is not required to remove except after such notice by Landlord, and such date would fall after the date on which Tenant would be required to remove other property.

  (c) **Holdover**

If tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all the provisions of this Lease, except the provision for the Term, and except the Base Rent provided herein shall double during the period of the month-to-month tenancy. Failure of Tenant to remove fixtures, furniture, furnishings or trade fixtures or to repair any damage caused by such removal that Tenant is required to remove and repair under this Lease shall constitute a failure to vacate to which this Section 19(c) shall apply if the property not removed or repaired will interfere with occupancy of the Premises by another tenant or with occupancy by Landlord for any purpose, including preparation for a new tenant.

20. **ASSIGNMENT AND SUBLETTING**

  (a) **Landlord's Consent**

Tenant shall not, either voluntarily or by operation of law, sell, assign, or transfer this Lease or sublet the Premises or any part thereof, or assign any right to use the Premises or any part thereof (each a "Transfer") without the prior written consent of Landlord, which consent shall not be unreasonably withheld, and any attempt to do so without such prior written consent shall be void and, at Landlord's option, shall terminate this Lease. If Tenant requests Landlord's consent to any Transfer, Tenant shall promptly provide Landlord with a copy of the proposed agreement between Tenant and its proposed transferee and with all such other information concerning the business and financial affairs of such proposed transferee as Landlord may request. Landlord may withhold such consent unless the proposed transferee (i) is satisfactory to Landlord as to credit, managerial experience, net worth, character, and business or professional standing, (ii) is a person or entity whose possession of the Premises would not be inconsistent with Landlord's commitments with other tenants or with the mix of uses Landlord desires at the

Please Initial



Landlord Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 21 of 48

Case 13-03291-elp Doc 12 Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

Property, (iii) will occupy the Premises solely for the use authorized under this Lease, (iv) expressly assumes and agrees in writing to be bound by and directly responsible for all Tenant's obligations hereunder, (v) will conduct a business that does not adversely impact the use of the Property's common areas, and (vi) will conduct its business in the Premises in such a manner so that the Percentage Rent payable to Landlord under this Lease will not likely be less than the Percentage Rent that would have been payable to Landlord had there been no Transfer. Landlord's consent to any such Transfer shall in no event release Tenant from its liabilities or obligations hereunder, including any renewal term, nor relieve Tenant from the requirement of obtaining Landlord's prior written consent to any further Transfer. Landlord's acceptance of rent from any other person shall not be deemed to be a waiver by Landlord of any provision of this Lease or a consent to any Transfer. No modification, amendment, assignment, or sublease shall release Tenant, any assignee, or any guarantor of its liabilities or obligations under this Lease.

(b)     **Payment to Landlord and Termination of Lease**

i.      Landlord may, as a condition to its consideration of any request for consent to a proposed Transfer, impose a fee in the amount of Seven Hundred Fifty and No/100 Dollars ($750.00) to cover Landlord's administrative expenses and Tenant shall also be responsible to promptly pay all Landlord's reasonable legal fees and expenses in connection therewith. Such fee shall be (i) payable by Tenant upon demand, and (ii) retained by Landlord, regardless of whether such consent is granted.

ii.     If any such proposed Transfer provides for the payment of, or if Tenant otherwise receives, rent, additional rent, or other consideration for such Transfer that is in excess of the Rent and all other amounts Tenant is required to pay under this Lease (regardless of whether such excess is payable on a lump-sum basis or over a term), then in the event Landlord grants its consent to such proposed Transfer, Tenant shall pay Landlord the amount of such excess as it is received by Tenant. Any violation of this paragraph shall be deemed a material and noncurable breach of this Lease.

iii.    If Tenant proposes a sublease or assignment, Landlord shall have the option to terminate this Lease and deal directly with the proposed sublessee, assignee, or any third party with regard to the Premises.

iv.     If Tenant is a corporation, an unincorporated association, a partnership, a limited partnership, or a limited liability company, the transfer, assignment or hypothecation of any stock or interest in such entity in the aggregate in excess of twenty-five percent (25%) shall be deemed a Transfer of this Lease within the meaning and provisions of this Section 20.

21.     **SUBORDINATION**

Tenant's interest hereunder shall be subject and subordinate to all mortgages, trust deeds, and other financing and security instruments in place upon the Commencement Date or placed on the Premises by Landlord from time to time (hereafter "Mortgage"), except that no assignment or transfer of Landlord's rights hereunder to a lending institution as collateral security in connection with a Mortgage shall affect Tenant's right to possession, use, and occupancy of the Premises so long as Tenant shall not be in default under any of the terms and conditions of this Lease. The provisions of this Section 21 shall be self-operating. Nevertheless, Tenant agrees to execute, acknowledge and deliver to Landlord within ten (10) days after Landlord's written request, an instrument in recordable form that expressly subordinates Tenant's interest hereunder to the interests of the holder of any Mortgage, and that includes any other reasonable provisions requested by the holder or prospective holder of any Mortgage. At Landlord's request, Tenant shall furnish Landlord current balance sheets, operating statements, and other financial statements in the form as reasonably requested by Landlord or by the holder or prospective holder of

Please Initial

R.B.

Landlord     Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 22 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

any Mortgage, certified by Tenant as accurate and current. Tenant agrees to sign an authorization for Landlord to conduct a check of Tenant's credit as requested by Landlord from time to time.

## 22. TRANSFER OF THE PROPERTY

If the Property is sold or otherwise transferred by Landlord or any successor to Landlord, Tenant shall attorn to the purchaser or transferee and recognize it as the landlord under this Lease , and, provided the purchaser or transferee assumes all obligations under this Lease thereafter accruing, the transferor shall have no further liability hereunder.

## 23. ESTOPPEL CERTIFICATE

Tenant shall from time to time, upon not less than ten (10) days' prior notice, submit to Landlord, or to any person designated by Landlord, a statement in writing, in the form submitted to Tenant by Landlord, certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, identifying the same by the date thereof and specifying the nature thereof), that to the knowledge of Tenant no uncured default exists hereunder (or if such uncured default does exist, specifying the same), the dates to which the Rent and other sums and charges payable hereunder have been paid, that Tenant has no claims against Landlord and no defenses or offsets to rental except for the continuing obligations under this Lease (or if Tenant has any such claims, defenses, or offsets, specifying the same), and any other information concerning this Lease as Landlord reasonably requests.

## 24. PERFORMANCE BY LANDLORD

Landlord shall not be deemed in default for the nonperformance or for any interruption or delay in performance of any of the terms, covenants, and conditions of this Lease if the same shall be due to any labor dispute, strike, lockout, civil commotion, or like operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain labor, services or materials, through acts of God, or other cause beyond the reasonable control of Landlord, providing such cause is not due to the willful act or neglect of Landlord.

## 25. LANDLORD'S RIGHT TO CURE DEFAULT

If Tenant shall fail to perform any of the covenants or obligations to be performed by Tenant, Landlord, in addition to all other remedies provided herein, shall have the option (but not the obligation) to cure such failure to perform after fifteen (15) days' written notice to Tenant. All Landlord's expenditures incurred to correct the failure to perform shall be reimbursed by Tenant upon demand with interest from the date of expenditure at the legal rate of interest if not defined. Landlord's right to cure Tenant's failure to perform is for the sole protection of Landlord and the existence of this right shall not release Tenant from the obligation to perform all the covenants herein provided to be performed by Tenant, or deprive Landlord of any other right Landlord may have by reason of default of this Lease by Tenant.

## 26. INSPECTION

Landlord, Landlord's agents, and representatives, shall have the right to enter upon the Premises at any time in the event of emergency and, in other events, at reasonable times after prior verbal notice for the purpose of inspecting the same, for the purpose of making repairs or improvements to the Premises or the Building, for showing the Premises during the final ninety (90) days of the Term, or for any other lawful purpose.

## 27. FOR SALE AND FOR RENT SIGNS

During the period of one hundred eighty (180) days prior to the date for the termination of this Lease, Landlord may post on the Premises or in the windows thereof signs of moderate size notifying the public that the Premises are "for sale" or "for rent" or "for lease."

## 28. ATTORNEY FEES

In the event a suit, action, arbitration, or other proceeding of any nature whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is instituted, or the services of an attorney are retained to interpret or enforce any provision of this Lease or with respect to any dispute relating to this Lease, the prevailing or



Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 23 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

nondefaulting party shall be entitled to recover from the losing or defaulting party its attorneys', paralegals', accountants', and other experts' fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith. In the event of suit, action, arbitration, or other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts provided by law.

## 29. NOTICES

Any notice required or permitted under this Lease shall be in writing and shall be deemed given when actually delivered or when deposited in the United States mail as certified or registered mail, return receipt requested, addressed to the addresses set forth in the Summary of Fundamental Provisions of this Lease or to such other address as may be specified from time to time by either of the parties in the manner above provided for the giving of notice. Notice may also be given by facsimile or telecopy transmission and shall be effective upon the date shown in a transmittal record when sent to the party at the facsimile or telecopy number set out in the Summary of Fundamental Provisions of this Lease or such other number as provided by either party, as long as a copy of any such notice is deposited in the United States mail to such party at the above-mentioned address on the same date the electronic transmission is sent.

## 30. BROKERS

Tenant covenants, warrants, and represents that it has not engaged any broker, agent, or finder who would be entitled to any commission or fee in connection with the negotiation and execution of this Lease, except as set forth in the Summary of Fundamental Lease Provisions attached hereto. Tenant agrees to indemnify and hold harmless Landlord against and from any claims for any brokerage commissions and all costs, expenses, and liabilities in connection therewith, including attorney fees and expenses, arising out of any charge or claim for a commission or fee by any broker, agent, or finder on the basis of any agreements made or alleged to have been made by or on behalf of Tenant, except for brokers listed on the Summary of Fundamental Lease Provisions. The provisions of this Section 30 shall not apply to any brokers with whom Landlord has an express written brokerage agreement. Landlord shall be responsible for payment of any such brokers. Landlord shall pay Norris, Beggs & Simpson a commission equal to 6% of the base rent or $17,963.98. First ½ of Commission shall be paid within 30 days of lease execution after tenant waives contingencies and the second ½ of the commission shall be paid upon tenant's rent commencing, approximately May 1, 2013.

## 31. LATE CHARGES

Tenant acknowledges that late payment by Tenant to Landlord of any Rent or other charge due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs may include, without limitation, processing and accounting charges and late charges that may be imposed on Landlord under the terms of any Mortgage. Accordingly, if any Rent or other charge is not received by Landlord within *Seven* (*7* days after it is due, Tenant shall pay to Landlord a late charge equal to *Five* percent (*5%*) of the overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs incurred by Landlord by reason of the late payment by Tenant. Acceptance of any late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to the overdue amount in question, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

## 32. NO PERSONAL LIABILITY

The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Building and the Property, and neither Landlord nor any of its owners, principals, employees, or agents shall be liable for any deficiency.

Please Initial

R.B          Landlord          Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 24 of 48

33. **MISCELLANEOUS PROVISIONS**

    a)      This Lease does not grant any rights of access to light or air over any part of the Property.

    b)      Time is of the essence of this Lease.

    c)      The acceptance by Landlord of any Rent or other benefits under this Lease shall not constitute a waiver of any default.

    d)      Any waiver by Landlord of the strict performance of any of the provisions of this Lease shall not be deemed to be a waiver of subsequent breaches of the same character or of a different character, occurring either before or subsequent to such waiver, and shall not prejudice Landlord's right to require strict performance of the same provision in the future or of any other provision of this Lease.

    e)      This Lease contains the entire agreement of the parties and supersedes all prior written and oral agreements and representations and there are no implied covenants or other agreements between the parties, except as expressly set forth in this Lease.

    f)      Neither Landlord nor Tenant is relying on any representations except as expressly set forth in this Lease.

    g)      The parties acknowledge and agree that any calculations of square footage in the Premises and on the Property are approximations. Except as provided herein, no recalculation of square footage shall affect the obligations of Tenant under this Lease, including without limitation, the amount of Base Rent or other Rent payable by Tenant under this Lease.

    h)      This Lease shall not be amended or modified except by agreement in writing, signed by the parties hereto.

    i)      Subject to the limitations on the assignment or transfer of Tenant's interest in this Lease, this Lease shall be binding upon and inure to the benefit of the parties, their respective heirs, personal representatives, successors, and assigns.

    j)      No remedy herein conferred upon or reserved to Landlord or Tenant shall be exclusive of any other remedy herein provided or provided by law, but each remedy shall be cumulative.

    k)      In interpreting or construing this Lease, it is understood that Tenant may be more than one person, that if the context so requires, the singular pronoun shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed, and implied to make the provisions hereof apply equally to corporations, partnerships, limited liability companies, and individuals.

    l)      Section headings are for convenience and shall not affect any of the provisions of this Lease.

    m)      If any provision of this Lease or the application thereof to any person or circumstance is, at any time or to any extent, held to be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be



Please Initial

_R.B._    

Landlord    Tenant

CRS/gv
ls-back-clown.docx

EXHIBIT 1
Page 25 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

affected thereby, and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

n) All agreements (including, but not limited to, indemnification agreements) set forth in this Lease, the full performance of which are not required prior to the expiration or earlier termination of this Lease, shall survive the expiration or earlier termination of this Lease and be fully enforceable thereafter.

## 34. QUIET ENJOYMENT

Landlord warrants that as long as Tenant complies with all terms of this Lease, it shall be entitled to possession of the Premises free from any eviction or disturbance by Landlord or parties claiming through Landlord. Neither Landlord nor its managing agent shall have any liability to Tenant for loss or damages arising out of the acts, including criminal acts, of other tenants of the Building or third parties, and no such acts shall constitute an eviction, construction or otherwise.

## 35. ANTI-TERRORISM LAW

(a) **Tenant represents and warrants to Landlord as follows:**

i. Neither Tenant, its constituents, or affiliates, nor any of their respective agents (collectively, the "Tenant Parties") is in violation of any law relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing, the U.S. Bank Secrecy Act, as amended by the Patriot Act, the Trading with the Enemy Act, the International Emergency Economic Powers Act and all regulations promulgated thereunder, all as amended from time to time (collectively, "Anti-Terrorism Law").

ii. No action, proceeding, investigation, charge, claim, report, or notice has been filed, commenced, or threatened against any of the Tenant Parties alleging any violation of any Anti-Terrorism Law.

iii. None of the Tenant Parties has, after due inquiry, knowledge of any fact, event, circumstance, situation or condition that could reasonably be expected to result in any action, proceeding, investigation, charge, claim, report, notice, or penalty being filed, commenced, threatened, or imposed against any of them relating to any violation of or failure to comply with any Anti-Terrorism Law.

iv. None of the Tenant Parties is a "Prohibited Person." A Prohibited Person means any of the following:

(1) A person or entity that is "specially designated" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control or that is owned, controlled by, or acting for or on behalf of any such person or entity;

(2) A person or entity with whom Landlord is prohibited from dealing by any Anti-Terrorism Law:

(3) A person or entity that commits, threatens, or conspires to commit or supports "terrorism," as defined in any Anti-Terrorism Law.

v. None of the Parties:

Please Initial

Landlord    Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 26 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

(1)     Conducts any business or transactions or makes or receives any contribution of funds, goods, or services in violation of any Anti-Terrorism Law:

(2)     Engages in or conspires to engage in any transaction that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

(b)    **Tenant covenants that it shall not:**

i.     Conduct any business or transaction or make or receive any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

ii.     Engage in or conspire to engage in any transaction that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

iii.     Tenant agrees promptly to deliver to Landlord (but in any event within ten (10) days of Landlord's written request) any certification or other evidence requested from time to time by Landlord, in its reasonable discretion, confirming Tenant's compliance with the foregoing.

## 36.    FINANCIAL STATEMENTS

Within fifteen (15) days after Landlord's request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statements. Tenant will discuss its financial statements with Landlord and will give Landlord access to Tenant's books and records in order to enable Landlord to verify the financial statements. Landlord will not disclose any aspect of Tenant's financial statements except to (a) Landlord's lenders or prospective purchasers of the Building who have executed a sales contract with Landlord, (b) in litigation between Landlord and Tenant, and (c) if required by any court order.

## 37.    WAIVER OF JURY TRIAL

To the maximum extent permitted by law, Landlord and Tenant each waive their right to trial by jury in any litigation arising out of or with respect to this Lease.

## 38.    EXHIBITS AND ADDITIONAL PROVISIONS

Exhibits attached hereto are referred to in this Lease and by this reference incorporated herein. Additional provisions, if any, are set forth in Riders attached hereto and by this reference incorporated herein.

## 39.    REPRESENTATIONS; PREPARATION

THIS LEASE, ATTACHMENTS , AND AMENDMENTS WERE PREPARED AT THE DIRECTION OF LANDLORD AND TENANT, AND BOTH LANDLORD AND TENANT HAVE BEEN ADVISED AND HAD AN OPPORTUNITY TO SEEK INDEPENDENT COUNSEL TO REVIEW THIS LEASE, ATTACHMENTS, AND AMENDMENTS. THE RULE OF CONSTRUCTION THAT A WRITTEN AGREEMENT IS CONSTRUED AGAINST THE PARTY PREPARING OR DRAFTING SUCH AGREEMENT SHALL SPECIFICALLY NOT BE APPLICABLE TO THE INTERPRETATION OR ENFORCEMENT OF THIS LEASE, ATTACHMENTS, AND AMENDMENTS. NO REPRESENTATION OR RECOMMENDATION IS MADE BY BOMA PORTLAND OR THE REAL ESTATE BROKERS INVOLVED IN THIS TRANSACTION CONCERNING THE LEGAL SUFFICIENCY OR TAX CONSEQUENCES ARISING FROM THIS LEASE.

Please Initial

Landlord    Tenant

CRS/gv
ls-back-clown.docx

EXHIBIT 1
Page 27 of 48

Case 13-03291-elp   Doc 12   Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

*[Signatures on Following Page]*



Standard Form of RETAIL LEASE
Page 25



Please Initial

Landlord    Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 28 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

© **2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease in duplicate as of the day and year first above written, any corporate signature being by authority of the Board of Directors of the corporation.

_____
Landlord

_____

_____
Address

_____
Tenant

P O Box 90637

Portland OR 97290
Address

**Exhibits.**

The following Exhibit is attached hereto and incorporated as a part of this Lease:

| | | |
|---|---|---|
| Exhibit "A" | - | Premises |
| Exhibit "B" | - | Guaranty |
| Exhibit "C" | - | Optional Rider Option to Extend |
| Exhibit "D" | - | Optional Rider Optional Section 4 – Additional Rent (when base year is used) |
| Exhibit "E" | - | Optional Rider Work Agreement |
| Exhibit "F" | - | Optional Early Termination Clause |
| *Exhibit "G"* | - | *Furniture, Fixtures & Equipment List* |



Standard Form of RETAIL LEASE
Page 26

Please Initial

R.B.
Landlord      Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 29 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

EXHIBIT A

PREMISES



Standard Form of RETAIL LEASE
Exhibit A



Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 30 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

© **2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS**

## EXHIBIT B

### GUARANTY

In consideration of the agreement of ***Baek Family Partnership, LLC.***

("Landlord"), to enter into a Lease dated _____ (the "Lease") between Landlord and ***Clown Corp*** ("Tenant"), pertaining to certain premises located at ***8201 SE Powell, Portland, OR***, the undersigned ***Greg Thomas*** ("Guarantor") hereby unconditionally guarantees the punctual payment of all Rent, as defined in the Lease, and other payments required to be paid by Tenant, and the prompt performance of all other obligations of Tenant under the Lease. If Guarantor consists of more than one person or entity, all liability of Guarantor hereunder shall be joint and several.

Guarantor shall be directly and primarily liable to Landlord for any amount due from Tenant under the Lease, without requiring that Landlord first proceed against Tenant, join Tenant in any proceeding brought to enforce this Guaranty, or exhaust any security held by Landlord. Guarantor agrees that Landlord may deal with Tenant in any manner in connection with the Lease without the knowledge or consent of Guarantor and without affecting Guarantor's liability under this Guaranty. Without limiting the generality of the foregoing, Guarantor agrees that any extension of time, assignment of the Lease, amendment, or modification to the Lease, delay or failure by Landlord in the enforcement of any right under the Lease, or compromise of the amount of any obligation or liability under the Lease made with or without the knowledge or consent of Guarantor shall not affect Guarantor's liability under this Guaranty. Guarantor's liability under this Guaranty shall not be affected by any bankruptcy, reorganization, insolvency, or similar proceeding affecting Tenant, nor by any termination or disaffirmance of the Lease or any of Tenant's obligations thereunder in connection with such proceeding. This Guaranty shall remain in full force and effect until the performance in full to Landlord's satisfaction of all obligations of Tenant under the Lease.

Guarantor hereby waives any claim or other right now existing or hereafter acquired against Tenant that arises from the performance of Guarantor's obligations under this Guaranty, including, without limitation, any rights of contribution, indemnity, subrogation, reimbursement, or exoneration. Guarantor hereby agrees to indemnify Landlord and hold it harmless from and against all loss and expense, including legal fees, suffered or incurred by Landlord as a result of claims to avoid any payment received by Landlord from Tenant with respect to the obligations of Tenant under the Lease.

Guarantor hereby waives presentment, protest, notice of default, demand for payment, and all other suretyship defenses whatsoever with respect to any payment guaranteed under this Guaranty, and agrees to pay unconditionally upon demand all amounts owed under the Lease. Guarantor further waives any setoff, defense, or counterclaim that Tenant or Guarantor may have or claim to have against Landlord and the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

If Landlord retains an attorney to enforce this Guaranty or to bring any action or any appeal in connection with this Guaranty, the Lease, or the collection of any payment under this Guaranty or the Lease, Landlord shall be entitled to recover its attorney fees, legal expenses, costs, and disbursements in connection therewith, as determined by the court before which such action or appeal is heard, in addition to any other relief to which Landlord may be entitled. Any amount owing under this Guaranty shall bear interest from the date such amount was payable to Landlord to the date of repayment at a rate equal to the lesser of fifteen percent (15%) and the maximum rate permitted by law.

Standard Form of RETAIL LEASE
Exhibit B

Please Initial

R.B.

Landlord          Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 31 of 48

© **2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS**

Landlord shall have the unrestricted right to assign this Guaranty in connection with an assignment of the Lease without the consent of, or any other action required by, Guarantor. Each reference in this Guaranty to Landlord shall be deemed to include its successors and assigns, to whose benefit the provisions of this Guaranty shall also inure. Each reference in this Guaranty to Guarantor shall be deemed to include the successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty. Within ten (10) days after delivery of written demand therefor from Landlord, Guarantor shall execute and deliver to Landlord a statement in writing certifying that this Guaranty is unmodified and in full force and effect, which statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the premises or property. If any provision of this Guaranty is held to be invalid or unenforceable, the validity and enforceability of the other provisions of this Guaranty shall not be affected.

GUARANTOR: *Greg Thomas*

Social Security No.:

Driver's License No.:

State Issuing Driver's License: OR

Address for Notices: PO Box 90637
Portland, OR 97290

Dated: 12-11-12

Please Initial

Landlord      Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 32 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

EXHIBIT C

OPTIONAL RIDER

OPTION TO EXTEND

**1.      Right to Extend**

As long as this Lease remains free from default, and so long as Tenant does not assign the Lease or sublet any portion of the Premises, Tenant shall have the option to extend the term of this Lease for ***Two*** successive term(s) of ***Five*** years each, on the terms and conditions contained herein, except for Base Rent that shall be determined as hereinafter provided.  Other than as set forth herein, Tenant shall have no further option to extend this Lease. Exercise of each extension option shall be by written notice given to Landlord at least one hundred eighty (180) and not more than two hundred ten (210) days prior to expiration of the original term, or the preceding extended term, if any.

**2.      Determination of Rent**

During each extended term, Base Rent shall be adjusted to reflect the greater of (a) the fair market rental value of the Premises for the extended term, determined as hereinafter provided or (b) the Base Rent, Percentage Rent, and Additional Rent payable by Tenant immediately prior to the commencement of the extended term in question.  Within thirty (30) days after Tenant's notice of exercise of its right to extend, Landlord shall notify Tenant of its determination of the fair market rental value.  Within thirty (30) days after the effective date of such notice, Tenant shall either (i) notify Landlord of Tenant's acceptance of Landlord's determination of the fair market rental value, in which event Base Rent for the extended term in question shall be as so determined by Landlord; or (ii) notify Landlord of Tenant's rejection of Landlord's determination of the fair market rental value, in which event the fair market rental value shall be determined in accordance with Section 3 below.  The failure of Tenant to give any notice within the required time period shall be deemed an acceptance by Tenant of Landlord's determination of the fair market rental value.

**3.      Arbitration Procedure**

Within ten (10) days after Tenant's rejection of Landlord's determination of fair market rental value, each party shall designate a representative who is either an Oregon licensed MAI appraiser skilled in determining rental rates for retail space in the Portland, Oregon, metropolitan area, an owner of a Portland, Oregon, metropolitan area building containing retail space, or a real estate broker experienced in leasing retail space in the Portland, Oregon, metropolitan area.  The two representatives so chosen shall select an arbitrator having the above qualifications or, if they cannot agree, the presiding judge of the Circuit Court of Multnomah County, Oregon, shall, upon application by either party, select an arbitrator having the above qualifications.  At least ninety (90) days prior to the commencement of the extended term in question, each party's representative shall submit to the arbitrator a written report stating such representative's opinion of the fair market rental value of the Premises, based on a consideration of rental rates then being charged (under the most recently executed leases) in the Portland, Oregon metropolitan area for retail space comparable to the Premises.  Within thirty (30) days after receipt of such reports, the arbitrator shall accept one or the other of the reports.  The determination of the fair market rental value in the report so accepted shall be binding on the parties; provided, however, that Base Rent during any extended term shall not in any event be less than the Base Rent payable by Tenant immediately prior to the commencement of such extended term.  The cost of the determination of the fair market rental value pursuant to this Section 3 shall be shared equally by Landlord and Tenant.  If the arbitrator does not decide the fair market rental value to be paid prior to commencement of the extended term in question, Rent shall continue to be payable in the amount previously in effect, and retroactive adjustment shall be made when the arbitrator reaches a decision.

Please Initial

R.B.

Landlord      Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 33 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

EXHIBIT D

OPTIONAL RIDER

OPTIONAL SECTION 4 - ADDITIONAL RENT
(WHEN BASE YEAR IS USED)

The following Section 4 hereby supersedes and replaces Section 4 in the Lease:

**4. ADDITIONAL RENT**

(a) **Operating Expenses**

In addition to Base Rent, Tenant shall pay to Landlord a portion of the Operating Expenses incurred by Landlord in connection with the Property. The term "Operating Expenses" shall mean all expenses paid or incurred by Landlord or on Landlord's behalf, as reasonably determined by Landlord to be necessary or appropriate for the efficient operation, management, maintenance, and repair of the land and the Building. Operating Expenses shall also include the cost of any capital improvement to the Property or Building, amortized with a reasonable finance charge over the shorter period of (i) its useful life or (ii) the longest period during which the cost can be amortized under applicable tax laws; provided, however, that such capital improvements shall include only roof, heating, air conditioning, and sprinkler systems, and those that are required by applicable building codes or laws, or those that Landlord reasonably believes will improve the operating efficiency of the Building or the Property Operating Expenses shall also include a reasonable management fee to be paid by Tenant to Landlord in an amount equal to Landlord's total management fee multiplied by Tenant's share of Operating Expenses for the retail areas of the Building. Tenant shall pay to Landlord an amount each month which is equal to one-twelfth (1/12) of the estimated Annual Operating Expenses, as provided in Section 4(c) below. Tenant's share of Operating Expenses shall equal _____ percent (_____%) of those Operating Expenses applicable to the retail areas of the Building and _____ percent (_____%) of those Operating Expenses applicable to the Property and the Building in general. Landlord shall allocate Operating Expenses to the retail areas in the Building and to the Property and the Building in general, in Landlord's reasonable discretion.

(b) **Property Taxes and Insurance**

In addition to Base Rent, Tenant shall pay _____ percent (_____%) of all increases in real property taxes and assessments levied, assessed, or imposed during the Term upon the Property ("Taxes") and _____ percent (_____%) of the costs of insurance provided by Landlord pursuant to Section 5(a) ("Insurance") over the Base Year. Tenant shall pay to Landlord an amount each month which is equal to one-twelfth (1/12) of the estimated increases in annual Taxes and Insurance together with Tenant's payments of Operating Expenses, as provided in Section 4(c) below. If, during the Term, the voters of the state in which the Premises are located or the state legislature enacts a real property tax limitation, then any substitute taxes, in any name or form, that may be adopted to replace or supplement real property taxes shall be added to Taxes for purposes of this Section 4(b). Should there be in effect during the Term any law, statute, or ordinance that levies, assesses, or imposes any tax (other than federal or state income tax) upon rents, Tenant shall pay such taxes as may be attributable to the Rents under this Lease or shall reimburse Landlord for any such taxes paid by Landlord within ten (10) days after Landlord bills Tenant for the same.

(c) **Payment of Operating Expenses, Taxes and Insurance**

Landlord shall notify Tenant of Tenant's required estimated monthly payments of Operating Expenses, Taxes, and Insurance. Beginning on the Commencement Date, and continuing throughout the Term,

Standard Form of RETAIL LEASE
Exhibit D



Please Initial

Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 34 of 48

## © 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

Tenant shall make such monthly payments on or before the first day of each calendar month. Landlord may, from time to time, by written notice to Tenant, change the estimated monthly amount to be paid. No interest or earnings shall be payable by Landlord to Tenant on any amount paid under this Section 4, and Landlord may commingle such payments with other funds of Landlord. Landlord shall, within ninety (90) days after the close of each calendar year or as soon thereafter as is practicable, deliver to Tenant a written statement setting forth the actual increases in Operating Expenses, Taxes, and Insurance over the Base Year for the year in question, together with a computation of the charge or credit to Tenant of any difference between the actual costs and the estimated cost paid by Tenant for such period; and any such difference shall be applied to amounts subsequently due from Tenant to Landlord, or if no such sums are or will be owed, then such sums shall be paid or reimbursed, as applicable, within ten (10) days after Landlord gives Tenant notice thereof. If Tenant has any objections to the annual statement made by Landlord, such objections shall be made in writing given to Landlord within thirty (30) days after the statement is submitted to Tenant. If no objection is made within such time period, the annual statement shall be conclusive and binding on Tenant. If Tenant desires to review any of Landlord's records pertaining to Operating Expenses, Taxes, or Insurance, Tenant may do so after reasonable prior notice given to Landlord, but no more often that once during any calendar year. Such review shall take place where such records are kept, and shall be conducted by a certified public accountant chosen by Tenant, subject to Landlord's prior written approval, which shall not be unreasonably withheld. Tenant shall pay all costs of such review including, without limitation, reimbursement for time incurred by Landlord's representatives and photocopy charges.



Standard Form of RETAIL LEASE
Exhibit D

Please Initial

R.B.
Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 35 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

EXHIBIT E

OPTIONAL RIDER

WORK AGREEMENT
(This version of Exhibit E to be used if Tenant completing initial Buildout)

**SECTION 1    Plans.**

1.1    Finalization of Plans. Tenant has previously provided to Landlord preliminary plans drawings, and specifications, as more fully described in Exhibit E-1 attached hereto, for the initial tenant improvement work to be performed within the Premises (the "Preliminary Plans"). Within two (2) weeks after the date of execution of the Lease, Tenant shall deliver to Landlord:

   a)    Drawings, plans and specifications for the initial Tenant Improvement Work, consistent with the Preliminary Plans and in form and substance sufficient to be submitted as part of an application for a building permit. Such documents must be stamped as approved by Landlord's architect, if required by Landlord. Tenant shall use Landlord's architect, unless otherwise agreed in writing by Landlord and Tenant.

   b)    The name, telephone number, emergency telephone numbers, and addresses of Tenant's proposed general contractor ("General Contractor") and the proposed plumbing, mechanical, and electrical subcontractors, if any.

   c)    A construction schedule indicating the actual commencement date of construction, weekly construction activities, and substantial completion date.

1.2    Approval. Landlord shall have the right to approve the plans and proposed contractors submitted by Tenant as set forth in Section 1.1a)-1.1c) above. Landlord's approval shall not to be unreasonably withheld, conditioned, or delayed. If Landlord does not give notice of disapproval, make a written request for additional information, or make corrections or changes to Tenant's submissions within ten (10) days after Tenant submits the same to Landlord for approval, then the submitted item or proposed contractor shall be deemed approved. If Landlord gives notice of disapproval, makes a written request for additional information, or makes corrections or changes to Tenant's submissions, Tenant shall propose alternative contractors, provide such requested information, or make such corrections or changes within five (5) days thereafter and resubmit same to Landlord. This process shall continue until the plans and contractors are approved by Landlord.

1.3    Final Plans. The drawings, plans, and specifications, once approved in accordance with the foregoing procedure, shall hereinafter be referred to as the "Final Plans."

**SECTION 2    Tenant Improvement Work.**
As used in this Work Agreement, "Tenant Improvement Work" means all work shown on the Final Plans, as they may be amended from time to time in accordance with the terms of this Work Agreement.

**SECTION 3    Changes to the Final Plans.**
Tenant shall not make any changes to the Final Plans without Landlord's prior written approval. Landlord's consent to changes shall not be unreasonably withheld, conditioned, or delayed. Tenant shall be responsible for any increase

Standard Form of RETAIL LEASE
Exhibit E

Please Initial

R.B.
Landlord    Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 36 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

in costs and expenses of the Tenant Improvement Work resulting from such changes, including any costs and expenses for review, and costs and expenses relating to delays in completion, to the extent such costs and expenses exceed the Tenant Improvement Allowance (defined in Section 4 below). If Tenant requests Landlord's approval of a proposed change in the Final Plans, and if the proposed change causes a delay in substantial completion of the Tenant Improvement Work, the Commencement Date as set forth in Section 1 of the Lease shall not be delayed.

**SECTION 4      Allocation of Costs.**

4.1      Tenant's Costs. Tenant shall pay all costs and expenses of the Tenant Improvement Work, subject to the terms and conditions set forth in this Work Agreement, and the terms and conditions set forth in the Lease. Tenant's failure to make any payment required under this Work Agreement shall be a default under the Lease, without the requirement of any notice of default or cure period, and all such unpaid amounts shall be additional rent under the Lease.

4.2      Tenant Improvement Allowance.

        a)      Subject to this Section 4.2, Landlord shall provide Tenant with up to **_Zero_** Dollars **_($0)_** (the "Tenant Improvement Allowance") to be applied to the Costs (as defined in Section 4.2b) below) of the Tenant Improvement Work. Any portion of the Tenant Improvement Allowance not applied to Costs shall be retained by Landlord.

        b)      As used in this Work Agreement, the term "Costs" means reasonable hard construction costs, overhead and profit, architectural, engineering, and design fees and expenses, the costs of obtaining permits, the costs of measuring the rentable square footage of the Premises, Landlord's costs of reviewing any plans, specifications or drawings, the architect's fees, Landlord's project management fee, and costs associated with sustainability practices, if any.

        c)      The Tenant Improvement Allowance, or applicable portion thereof, shall be paid by Landlord to Tenant in a single payment upon substantial completion (as defined in Section 8 below) of the Tenant Improvement Work, provided that the conditions set forth in this Section 4.2c) are satisfied. Upon substantial completion of the Tenant Improvement Work, Tenant shall submit the following to Landlord: ((i) paid invoices (together with such supporting documentation as Landlord may reasonably request) for all Costs for which Tenant seeks reimbursement from the Tenant Improvement Allowance, (ii) a certification from the architect that all the work or supplies so invoiced have in fact been applied to the Tenant Improvement Work, and (c) final, unconditional waivers and releases of lien rights from all contractors and subcontractors, in a form reasonably acceptable to Landlord. Following Landlord's receipt and approval of the items described in the foregoing clauses (a) through (c), which approval shall not be unreasonably withheld, Landlord shall reimburse Tenant up to the amount of the applicable Costs, to the extent of the Tenant Improvement Allowance. Landlord shall not be obligated to make any payment of any part of the Tenant Improvement Allowance if there are any liens, suits, actions, or proceedings pending that may affect the Building or the Land with respect to any Tenant Improvement Work, or if Tenant is otherwise in default of its obligations under the Lease at the time the disbursement is requested or is to be made. Landlord may offset against the Tenant Improvement Allowance to reduce Landlord's damages in such event (without thereby waiving or curing the default).

Please Initial

Landlord      Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 37 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

SECTION 2    **Construction Bond; Insurance.**

Landlord may require Tenant's General Contractor to post a payment and performance bond equal to the estimated cost of the Tenant Improvement Work. Tenant shall provide, or shall cause Tenant's General Contractor to provide, evidence of the following insurance coverages prior to commencing work and upon demand during the course of construction:

a)    Workers Compensation for statutory limits in compliance with applicable state and federal laws.

b)    Commercial general liability with limits not less than $5,000,000 combined single limit per occurrence for Bodily Injury and Property Damage, naming Landlord and its building manager as additional insureds.

Each certificate of insurance must contain a provision confirming that no cancellation or material change in the policies will be effective except upon thirty (30) days' prior written notice to Landlord.

SECTION 3    Cooperation, Progress Meetings.

Tenant designates _____, _____ (address), telephone number: _____, cell number: _____ fax number: _____, e-mail: _____ as "Tenant's Construction Representative" who shall be available for onsite and telephone consultations and decisions as necessary. If Tenant's Construction Representative is not readily available, _____, _____ (address), telephone number: _____, cell number: _____ fax number: _____, e-mail: _____ shall be the designated alternate representative. Tenant's Construction Representatives shall have the authority to bind Tenant as to all matters relating to the Tenant Improvement Work. Landlord's designated construction representative is _____ (address), telephone number: _____, cell number: _____ fax number: _____, e-mail: _____. During construction of the Tenant Improvement Work, Landlord and Tenant each shall respond to requests for information or decisions within a reasonable time. Without limiting the foregoing, each party shall cooperate with the other to facilitate and expedite the efficient design and construction of the Tenant Improvement Work. Tenant's and Landlord's representatives shall hold regular meetings at a reasonable time (but not required more often than weekly) regarding the progress of the Tenant Improvement Work, which meeting shall be held at a location designated by Tenant on the construction site, or as otherwise mutually agreed by Landlord and Tenant.

SECTION 4    **Construction Inspection; Notice of Nonresponsibility.**

Landlord and Landlord's representatives, agents and building management employees shall at all times during construction have access to the construction site to conduct periodic construction inspections provided said inspections do not unreasonably interfere with Tenant's contractors or subcontractors. Landlord may at any time post one or more notices of nonresponsibility at the Premises.

SECTION 5    **Commencement Date.**

The Commencement Date shall be as set forth in Section 1 of the Lease, notwithstanding the date of substantial completion of the Tenant Improvement Work. For purposes of this Work Agreement and the Lease, the term "substantial completion" with respect to the Tenant Improvement Work means that the Tenant Improvement Work has been completed substantially in accordance with the Final Plans, notwithstanding that minor or insubstantial details of construction, mechanical adjustment, or decoration remain to be performed, the noncompletion of which does not materially adversely interfere with Tenant's beneficial use of the Premises. ***Tenant shall be allowed the right by Landlord to install a rear exit door in the space at tenant's cost in the future. Plans and contractor shall be reasonably approved by Landlord prior to construction commencement.***



Standard Form of RETAIL LEASE
Exhibit E

Please Initial

Landlord    Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 38 of 48

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

## SECTION 6    Punch List.

Upon substantial completion of the Tenant Improvement Work, Landlord and Tenant shall promptly jointly inspect the Premises and note any additional items of Tenant Improvement Work that remain to be completed. On the basis of the joint inspection, Landlord shall prepare a list (the "Punch List") setting forth all the items of Tenant Improvement Work that remain to be completed. The joint inspection, delivery of the Punch List, and completion of the Punch List are not prerequisites to the occurrence of substantial completion or the occurrence of the Commencement Date. Tenant shall use reasonable efforts to cause all items set forth on the Punch List to be completed within one (1) month following preparation of the Punch List.

## SECTION 7    Construction Rules.

Tenant shall be responsible for assuring its General Contractor's compliance with the construction rules attached hereto as Exhibit E-2.  Landlord reserves the right to implement additional rules and regulations as it may deem necessary.

## SECTION 8    Effect of Work Agreement.

Except as specifically modified by the terms and conditions of this Work Agreement, all terms and conditions of the Lease remain in full force and effect and all such terms and conditions apply to the performance of the parties' obligations under this Work Agreement.  In the event of a conflict between the terms hereof and the terms of the Lease, the terms hereof shall control.

## SECTION 9    Use of Capitalized Terms.

Terms capitalized, but not defined herein, shall have the meaning set forth in the Lease.

*[Signatures on Following Page]*

Standard Form of RETAIL LEASE
Exhibit E

Please Initial

Landlord        Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 39 of 48

**© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS**

IN WITNESS WHEREOF, the parties hereto have executed this Work Agreement to be effective as of the execution date of the Lease:

**Tenant:**                                    **Landlord:**

By: _____          By: _____

Date: __/__/__ 12                        Date: '2/14/12

Exhibit E-1 - Preliminary Plans

Exhibit E-2 - Construction Rules



Standard Form of RETAIL LEASE
Exhibit E

Please Initial

Landlord    Tenant
                  CRS/gv
            ls-baek-clown.docx

EXHIBIT 1
Page 40 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

Standard Form of RETAIL LEASE

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

**EXHIBIT E-1**

**PRELIMINARY PLANS**



Standard Form of RETAIL LEASE
Exhibit E

Please Initial

Landlord    Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 41 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

## EXHIBIT E-2

## CONSTRUCTION RULES

a)      The General Contractor acknowledges that this building is or may be in the future certified/rated pursuant to the U.S. EPA's Energy Star or the U.S. Green Building Council's rating system.

b)      An agent or representative of General Contractor must be present on the site at all times when work is in process.

c)      All inspections that must be performed by testing any or all of the life safety system, e.g., alarms, annunciator, voice activated, strobe lights, etc., must be performed prior to 8:00 a.m. or after 4:30 p.m., and the on-site engineer must be present. At least forty-eight ( 48) hours' notice must be provided to the Building Manager advising that an inspection has been requested.

d)      The use of the freight elevator for deliveries and removals shall be scheduled in advance by General Contractor with the Building Manager for the transfer of all construction materials, tools, and trash to and from the construction floor. Passenger elevators shall not be used for these purposes. Large transfers of materials, whether for deliveries or removals, must be done prior to 7:00 a.m. or after 6:00 p.m. No deliveries of any kind or nature shall be brought in through the front door of the Building at any time.

e)      General Contractor shall take all necessary precautions to protect all walls, carpets, floors, furniture, fixtures, and equipment outside the work area and shall repair or replace damaged property without cost to Landlord.

f)      Sources of water and electricity will be furnished to General Contractor without cost, in reasonable quantities for use in lighting, power tools, drinking water, water for testing, etc. "Reasonable quantities" will be determined on a case-by-case basis but are generally intended to mean quantities comparable to the water and electrical demand Tenant would use upon taking

g)      Demolition of an area in excess of one hundred (100) square feet must be performed before 8:00 a.m. or after 6:00 p.m. General Contractor shall notify the Building Manager's office at least one (1) full business day prior to commencement of extremely dusty work (sheet rock cutting, sanding, extensive sweeping, etc.) so arrangements can be made for additional filtering capacity on the affected HVAC equipment. Failure to make such notification will result in General Contractor's absorbing the costs to return the equipment to its proper condition. All lights must be covered during high dust construction due to a plenum return air system.

h)      All painting must be completed outside of normal office hours (after 5:00 PM and before 7:00 AM) or on weekends. Paints used on site shall be low-VOC and are to be brush-applied only; spray painting is not allowed on site unless prior approval is obtained from Building Manager.

i)      Any and all existing building materials removed and not reused in the construction shall be disposed of by General Contractor as waste or unwanted materials, unless otherwise directed by the Building Manager. General Contractor shall at all times keep areas outside the work area free from waste material, rubbish, and debris and shall remove waste materials from the Building on a daily basis. Upon construction completion, General Contractor shall remove all debris and thoroughly clean the work area and any common areas impacted by the work.



Standard Form of RETAIL LEASE
Exhibit E

Please Initial

R.B.

Landlord          Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 42 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

j)      General Contractor agrees to provide the Building Manager with at least seventy-two (72) hours advance notice of all chemicals to be used on site through written notice and delivery of MSDS sheets.

k)      Standard construction hours are 6:30 a.m. - 5:00 p.m. The Building Manager must be notified at least two (2) full business days in advance of any work that may disrupt normal business operations, e.g., drilling or cutting of the concrete floor slab. The Building Manager reserves the right to determine what construction work is considered inappropriate for normal business hours.

l)      No abusive language or actions on the part of the workers will be tolerated. It will be the responsibility of General Contractor to enforce this regulation on a day-to-day basis. General Contractor and subcontractors shall remain in the designated construction area so as not to unnecessarily interrupt other tenants. All workers must wear company identification.

m)      General Contractor is to perform a thorough inspection of all common areas to which it requires access prior to construction to document existing Building conditions. Upon completion of work, if necessary, General Contractor shall return these areas to the same condition in which they were originally viewed. Any damage caused by General Contractor shall be corrected at its sole cost.

n)      General Contractor or subcontractor signage may not be displayed in the Building common areas or on any of the window glass.

o)      In case of emergency, General Contractor shall call the police/fire department and/or medical services, followed immediately by a call to the Building Manager.

At no time will the Building staff accept deliveries on behalf of General Contractor or any subcontractor.



Standard Form of RETAIL LEASE
Exhibit E

Please Initial

Landlord      Tenant
CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 43 of 48

Standard Form of RETAIL LEASE

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

EXHIBIT F

OPTIONAL RIDER

OPTIONAL EARLY TERMINATION CLAUSE

Provided Tenant is not then in breach or default of any obligation hereunder, Tenant shall have the right upon _____ ( ) days' prior written notice to Landlord, given between the date of _____ and the date of _____ (the "Notice Window"), to terminate the term of this Lease. Tenant's termination of the Lease shall be effective only if it is accompanied with a cash payment to Landlord in the amount of $_____ (the "Termination Fee"), and only if it is given within the Notice Window. If Tenant fails to provide written notice of termination and pay such Termination Fee within the Notice Window, then Tenant's option to terminate the Lease early shall expire and be of no further force or effect.



Standard Form of RETAIL LEASE
Exhibit F

Please Initial

_R. B._ _____
Landlord    Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 44 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

© 2011 PORTLAND ASSOCIATION OF BUILDING OWNERS AND MANAGERS

## *EXHIBIT G*

### ASSET PURCHASE AGREEMENT

All Fixed Assets, Including Equipment, Fixtures, Furnishings,
Furniture, Leasehold Improvements, And Other Items Listed

Josun Korean Grill Sign on building installed by Pop Signs
RC-P300 Rice Cooker
ISP—J-W-13 Imperial Wok Stove
EBA-3223 Imperial char-rock broiler
IR-4-G12 Imperial 4 Burner Stove
12" griddle/1 oven
IFS-40 Imperial Fryer
(2)30x18 Stainless Steel Work Tables
Coffee Brewer Machine
QY-0134A Manitowoc Ice Machine
T-72 True 3 Drawer Refrigerator
T-49F True 2 Drawer Freezer
(3)Comp't sink 18x18 w/2 drainboards
(2)Comp't sink 18x18 w/2 drainboards
(4) Hand sinks and faucets with wall mounts
TBB-4 True Back bar cooler
TBB-4G True back bar cooler w/glass doors
Speed Rails
TSSU-72-18 True 72" sandwich unit
(2)30x72 s/s work table
(4)30x48 s/s work table
R-211LCF Sharp Microwave
36' Heat Strip
(4)12x36 s/s wall shelfs

2x Wing Tables
Hongs Inc: New sandwich prep table/refrigerator
Ikea: Furniture – six white leather couches
Banquet Seating and Tables
Fry's: Speakers, Stereo, Printer, I-Pod
Cameras and security system DVR system
Hongs Inc: Kitchen equipment & small wares
Safe

Pittman: Snow cone maker

Sam Jin Furniture: Kimchi refrigerator
(2) condiment tables – customer made by Modern Vision Construction

Computer system

Standard Form of RETAIL LEASE
Exhibit F

Please Initial

R. B.
Landlord      Tenant

CRS/gv
ls-baek-clown.docx

EXHIBIT 1
Page 45 of 48

## OREGON REAL ESTATE AGENCY
## DISCLOSURE PAMPHLET
## (ORS 696.820 and OAR 863-015-215(4))

*This pamphlet describes agency relationships and the duties and responsibilities of real estate licensees in Oregon. This pamphlet is informational only and neither the pamphlet nor its delivery to you may be construed to be evidence of intent to create an agency relationship.*

### Real Estate Agency Relationships

An "agency" relationship is a voluntary legal relationship in which a real estate licensee (the "agent") agrees to act on behalf of a buyer or a seller (the "client") in a real estate transaction. Oregon law provides for three types of agency relationships between real estate agents and their clients:

**Seller's Agent** – Represents the seller only;

**Buyer's Agent** – Represents the buyer only;

**Disclosed Limited Agent** – Represents both the buyer and seller, or multiple buyers who want to purchase the same property. This can be done only with the written permission of both clients.

*The actual agency relationships between the seller, buyer and their agents in a real estate transaction must be acknowledged at the time an offer to purchase is made. Please read this pamphlet carefully before entering into an agency relationship with a real estate agent.*

### Duties and Responsibilities of an Agent
### Who Represents Only the Seller or Only the Buyer

Under a written listing agreement to sell property, an agent represents only the seller unless the seller agrees in writing to allow the agent to also represent the buyer. An agent who agrees to represent a buyer acts only as the buyer's agent unless the buyer agrees in writing to allow the agent to also represent the seller. An agent who represents only the seller or only the buyer owes the following affirmative duties to their client, other parties and their agents involved in a real estate transaction:

1. To exercise reasonable care and diligence;

2. To deal honestly and in good faith;

3. To present all written offers, notices and other communications in a timely manner whether or not the seller's property is subject to a contract for sale or the buyer is already a party to a contract to purchase;

4. To disclose material facts known by the agent and not apparent or readily ascertainable to a party;

5. To account in a timely manner for money and property received from or on behalf of the client;

6. To be loyal to their client by not taking action that is adverse or detrimental to the client's interest in a transaction;

7. To disclose in a timely manner to the client any conflict of interest, existing or contemplated;

8. To advise the client to seek expert advice on matters related to the transactions that are beyond the agent's expertise;

9. To maintain confidential information from or about the client except under subpoena or court order, even after termination of the agency relationship; and

10. When representing a seller, to make a continuous, good faith effort to find a buyer for the property, except that a seller's agent is not required to seek additional offers to purchase the property while the property is subject to a contract for sale. When representing a buyer, to make a continuous, good faith effort to find property for the buyer, except that a buyer's agent is not required to seek additional properties for the buyer while the buyer is

EXHIBIT 1
Page 46 of 48

subject to a contract for purchase or to show properties for which there is no written agreement to pay compensation to the buyer's agent.

None of these affirmative duties of an agent may be waived, except #10, which can only be waived by written agreement between client and agent.

Under Oregon law, a seller's agent may show properties owned by another seller to a prospective buyer and may list competing properties for sale without breaching any affirmative duty to the seller. Similarly, a buyer's agent may show properties in which the buyer is interested to other prospective buyers without breaching any affirmative duty to the buyer.

Unless agreed to in writing, an agent has no duty to investigate matters that are outside the scope of the agent's expertise.

<h3 style="text-align:center">Duties and Responsibilities of an Agent<br>Who Represents More than One Client in a Transaction</h3>

One agent may represent both the seller and the buyer in the same transaction, or multiple buyers who want to purchase the same property only under a written "Disclosed Limited Agency" agreement, signed by the seller, buyer(s) and their agent.

When different agents associated with the same real estate firm establish agency relationships with different parties to the same transaction, only the principal broker (the broker who supervises the other agents) will act as a Disclosed Limited Agent for both the buyer and seller. The other agents continue to represent only the party with whom the agent already has an established agency relationship unless all parties agree otherwise in writing. The supervising principal broker and the agents representing either the seller or the buyer have the following duties to their clients:

1. To disclose a conflict of interest in writing to all parties;

2. To take no action that is adverse or detrimental to either party's interest in the transaction; and

3. To obey the lawful instruction of both parties.

An agent acting under a Disclosed Limited Agency agreement has the same duties to the client as when representing only a seller or only a buyer, except that the agent may not, without written permission, disclose any of the following:

1. That the seller will accept a lower price or less favorable terms than the listing price or terms;

2. That the buyer will pay a greater price or more favorable terms than the offering price or terms; or

3. In transactions involving one-to-four residential units only, information regarding the real property transaction including, but not limited to, price, terms, financial qualifications or motivation to buy or sell.

No matter whom they represent, an agent must disclose information the agent knows or should know that failure to disclose would constitute fraudulent misrepresentation. Unless agreed to in writing, an agent acting under a Disclosed Limited Agency agreement has no duty to investigate matters that are outside the scope of the agent's expertise.

*You are encouraged to discuss the above information with the agent delivering this pamphlet to you. If you intend for that agent, or any other Oregon real estate agent, to represent you as a Seller's Agent, Buyer's Agent, or Disclosed Limited Agent, you should have a specific discussion with him/her about the nature and scope of the agency relationship. Whether you are a buyer or seller, you cannot make a licensee your agent without their knowledge and consent, and an agent cannot make you their client without your knowledge and consent.*

EXHIBIT 1
Page 47 of 48

Case 13-03291-elp    Doc 12    Filed 01/10/14

# SALE/LEASE DISCLOSURES

There are many laws that may have an impact on (a) your decision to sell, buy, or lease property; (b) the documents required or beneficial for your transaction; and (c) your ownership or tenancy of the property. We, as real estate brokers, are not attorneys, engineers, surveyors, environmental consultants, architects, appraisers, or tax advisors. We recommend that you seek the advice of other advisors to assist you with your real estate transaction.

Examples of some of the laws to consider are:

A.    The Americans with Disabilities Act: In general, the ADA requires employers and owners of property that is open to the public to make their property and business establishments accessible to persons with disabilities. The ADA may require modifications to the property that you are considering buying or leasing.

B.    Tax Laws: Almost all real estate transactions have tax consequences to the parties involved. There is more than one way to structure a sale or lease transaction, each of which may have different tax consequences. You should obtain competent tax advice, especially if you want to defer the gain on the sale of property through a tax-deferred exchange.

C.    Environmental Laws: Various laws require removal and clean up of hazardous materials on, in, around, and under property. The responsibility for cleaning up hazardous materials may fall on owners or tenants even if those owners or tenants were not the parties who actually deposited those materials on the property. Various undesirable materials such as mold, asbestos, and contaminants may be present that may cause liability to owners and tenants. Inspections by experts are necessary to detect whether hazardous or undesirable materials are present. An attorney can advise you on the impact of laws if those materials are found.

D.    Zoning Laws, Building Codes, Etc.: You should determine whether the use (or proposed use) of the property meets applicable zoning codes and that the improvements on the property comply with applicable building codes. An architect or other design professional can help you with that analysis.

These are only examples of some of the laws that may affect your transaction. We will use our best skills as real estate brokers to assist you. We recommend that you consult with other competent advisors as well to help you analyze the condition of the property, the value of the property, and the impact of laws on the property and your transaction in selling, buying, or leasing property.



**Norris, Beggs & Simpson**
Commercial Real Estate Services, Worldwide

121 SW Morrison Street, Suite 200, Portland, Oregon 97204, (503) 223-7181
700 Washington Street, Suite 608, Vancouver, Washington 98660, (360) 852-9600
600 University Street, Suite 503, Seattle, Washington 98101, (425) 451-8100

Rev. 05/2003
sale lease disclosures.doc

EXHIBIT 1
Page 48 of 48

# Financial Statement

Proposed Business Name: Farmhouse Lounge

Financial Statement Current As Of: 12-11-12
_Date_

## Personal Data:

Full Name: Greg D. Thomas
SS #:
Birth Date: -50
Employer:
Bus. Phone: 503/351-7772

Address: PO Box 90637
Portland OR 97290
Home Phone: 503/774-3333
Occupation:

## Financial Condition:

| Assets | Dollar Amount | Liabilities | Dollar Amount |
|---|---|---|---|
| Cash – Checking Accounts | $ 30,000 | Current Debt (Credit Cards, Accounts) | $ 8,000 |
| Cash – Savings Accounts | $ 32,000 | Notes Payable | $ |
| Certificates of Deposit | $ | Taxes Payable | $ 12,000 |
| Securities – Stocks / Bonds / Mutual Funds | $ 250,000.00 | Real Estate Mortgages | $ 940,000.00 |
| Notes & Contracts Receivable | $ 150,000.00 | Other Liabilities (Specify) Tax | $ 20,000 |
| Life Insurance (Cash Surrender Value) | $ | Other Liabilities (Specify) | $ |
| Personal Property (Autos, Jewelry, etc.) | $ 150,000.00 | TOTAL LIABILITIES | $ 980,000.00 |
| Retirement Funds (IRAs, 401k) | $ | | |
| Real Estate (Market Value) | $ 1,900,000 | NET WORTH | $ 1,682,000.00 |
| Other Assets (Specify) Restrant Eqa | $ 150,000 | | |
| Other Assets (Specify) | $ | | |
| TOTAL ASSETS | $ 2,662,000.00 | | |

Signed _Greg Thomas_ Title Pres. Date 12-11-12

EXHIBIT 2
Page 1 of 1

Case 13-03291-elp    Doc 12    Filed 01/10/14